OPINION OF THE COURT
Smith, J.
The primary issues on this appeal are whether DNA profiling evidence is admissible in this State and, if so, whether it should have been admitted against defendant in this case. Because such evidence has been accepted and found reliable by the relevant scientific community and because no error was committed in the circumstances of this case, we affirm.
Facts
Defendant appeals, by permission of a Judge of this Court, from an order affirming his conviction for murder in the second degree, rape in the first degree, attempted sodomy in the first degree and burglary in the second degree. On September 15, 1987, 79-year-old Helen Kendrick was found dead in her apartment in the City of Albany. The investigation of her death focused on defendant when caseworkers from the Albany City Hostel, an organization which served developmentally disabled persons, during a routine check of defendant’s apartment, found a bloodstained T-shirt with gray and white hairs on it, bloodstained underwear and bloodstained sweatpants. Both defendant and the deceased were clients of the organization.
Even without the DNA profiling evidence, proof of defen *421 dant’s guilt is compelling. The day after the victim’s body was found, defendant told a social worker that he did not know the decedent, even though he had visited her in her apartment only three days before. During questioning by one of the detectives, defendant gave at least three conflicting accounts of how his shirt became bloodied. Defendant also gave an implausible account of how the decedent sustained her injuries. According to a detective, defendant stated that he "tripped” the decedent and she fell to the floor. Defendant noticed blood on the floor so he attempted to check her pulse by feeling in her vaginal area. Because he could not detect a pulse in the victim, he moved toward her chest area and attempted CPR. Unsuccessful in that attempt, he picked her up, thereby staining his clothes with her blood, dropped her to the floor, placed her face down and left the apartment. Defendant volunteered that he "didn’t choke her” although the detective never mentioned that she was choked. Defendant also offered that he did not have sexual intercourse with the victim although the detective made no mention of a sexual crime. Defendant told the detective, "I didn’t do it. I turned my head when somebody else did it.”
In addition, a microscopist testified that nylon from the carpet in the decedent’s apartment was on the decedent’s dress and on defendant’s T-shirt, underpants and sweatpants. She testified that fibers from a blanket in defendant’s bedroom were located on the decedent’s dress and underpants and on defendant’s T-shirt and underpants as well.
The DNA Issue
As stated, the primary issue on this appeal is the introduction of DNA profiling evidence. Such evidence, consisting of unique genetic characteristics belonging to an individual, can provide strong evidence of a person’s presence at and participation in a criminal act. In this case, DNA comparison was made of a bloodstain taken from defendant’s T-shirt, hair follicles taken from the deceased and blood drawn from the defendant. The conclusion was that the DNA print pattern on the defendant’s T-shirt matched the DNA print pattern from the deceased and that the DNA print pattern from the blood of the defendant was different from that of the decedent.
Prior to the trial, a hearing was held to determine whether or not the DNA evidence proffered should be admissible. Following that hearing the trial court ruled the evidence admissible and the defendant was convicted at a subsequent *422 trial (140 Misc 2d 306). The Appellate Division affirmed (183 AD2d 75).
Because the issue here is novel, we will discuss (1) the standard to be used in determining admissibility, (2) the use of DNA evidence in this case and (3) whether the standard was met here.[1]
The Standard of Admissibility
It should be emphasized that the inquiry here is into the reliability of the DNA evidence at the time of the proceedings in this case in 1988 and 1989. The DNA evidence was presented as novel scientific evidence requiring a determination as to its reliability (see, People v Magri, 3 NY2d 562, 565-566 [approving the use of radar in speed detection]; People v Middleton, 54 NY2d 42, 49-50 [holding that identification through bite marks is accepted by the scientific community]). While foundation concerns itself with the adequacy of the specific procedures used to generate the particular evidence to be admitted, the test pursuant to Frye v United States (293 F 1013) poses the more elemental question of whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally. Only that Frye question is before us. The issues of a proper foundation and of the adequacy of laboratory procedures here are not before us, though some of the arguments made by the parties appear not to make this distinction.
In determining whether the DNA profiling evidence was properly admissible, attention must focus on the acceptance of such evidence as reliable by the relevant scientific community. The long-recognized rule of Frye v United States (supra) is that expert testimony based on scientific principles or procedures is admissible but only after a principle or procedure has "gained general acceptance” in its specified field. In Frye (supra, at 1014) the court stated:
"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle *423 or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs” (emphasis supplied).
The Frye court rejected evidence that a person’s truthfulness could be determined by a study of systolic blood pressure.
This Court has noted that the particular procedure need not be "unanimously indorsed” by the scientific community but must be "generally acceptable as reliable” (see, People v Middleton, 54 NY2d 42, 49, supra)[2] Thus, the issue here concerns the acceptance by the relevant scientific community of the reliability of DNA evidence.
The Use of DNA Evidence in this Case
Prior to the trial in this case, a Frye hearing was held to determine whether the relevant scientific community had accepted DNA evidence as reliable. The trial court found that DNA evidence was accepted as reliable. Lifecodes Corporation (Lifecodes) was then asked to perform DNA fingerprint identification on items of biological evidence in this case. Specifically, Lifecodes was asked to analyze a bloodstain on a T-shirt belonging to defendant, hair follicles which were taken from the victim, and whole blood that was drawn from the defendant. At trial, after the Frye hearing had been held and the trial court had found DNA evidence to be reliable and in order to lay a foundation for its admission at trial, Dr. Michael Baird, Director of Forensic and Paternity Testing at Lifecodes, explained how each piece of evidence was analyzed. He stated that, in each instance, DNA was extracted from the nucleus of a cell and purified to get a fairly pure DNA sample, free of contaminants. Using a restrictive enzyme that recognizes a particular sequence of DNA, the DNA was then cut into shorter pieces. Agarose gel was then used to separate the *424 DNA pieces by length. The DNA pieces were then stained with ethidium bromide to permit increased visibility using ultraviolet light and to determine whether the separation by size was correctly done. Thereafter, the DNA was split into single strands and transferred from the gel to a nylon membrane. Next, a DNA probe,[3] which had been labelled with radioactive phosphate, was applied to the nylon membrane, causing the probe to bind with the complementary, single-stranded pieces of DNA. Any DNA probe that did not bind, as well as any excess DNA, were washed away. The nylon membrane was then placed on a piece of X-ray film and the pieces of the DNA probe that had been bonded to the membrane were revealed. The X-ray film, now referred to as an autorad, was then analyzed and compared with a known sample. This process is referred to as autoradiography. Dr. Baird concluded that the DNA print pattern that was generated from the bloodstain on the T-shirt matched the DNA print pattern from the victim’s hair follicles, and that pattern was different from the DNA pattern from defendant’s blood.
Application of the Standard to the Facts Here
Contrary to the contentions of the defendant, DNA profiling evidence is generally accepted as reliable by the relevant scientific community and was so accepted at the time of the Frye hearing in 1988. There was sufficient evidence in the record to support the hearing court’s determination on general reliability as a matter of law and, second, the determination comported with generally accepted scientific authority (see, People v Hughes, 59 NY2d 523, 543; see also, People v Taylor, 75 NY2d 277, 286).
The testimony in this case met the applicable standard of reliability. Several experts, including Dr. Sandra NierzwickiBauer, Dr. Richard John Roberts, Dr. Michael Baird, and Dr. Kenneth Kidd, testified to the acceptance of DNA profiling evidence by the relevant scientific community and to its reliability, as well as to the reliability of the procedures used by Lifecodes.[4]
*425 We hold that since DNA evidence was found to be generally accepted as reliable by the relevant scientific community and since a proper foundation was made at trial, DNA profiling evidence was properly admitted at trial. It was admitted under customary foundation principles. The foundation included testimony that the appropriate steps were taken in analyzing the DNA evidence and an analysis and explanation of the assumptions underlying the probability calculations (see, United States v Jakobetz, 955 F2d 786, 799-800). The foundation did not and should not include a determination of the court that such evidence is true. That function should be left to the jury (see, United States v Jakobetz, 955 F2d, at 796-797).
With respect to the assertion in the concurring opinion that the prosecution did not show that the relevant scientific community had accepted Lifecodes’ protocols for determining a match, it is clear that the testimony supported the conclusion that the procedures used by Lifecodes were generally accepted by the scientific community. The defendant did not raise the specific problem of matching at the Frye hearing, through its expert testimony or examination of the prosecution’s experts.
Moreover, the record supports the view that visual matching was accepted by the scientific community in 1988. "The use of simple visual comparisons to determine whether two prints match is widespread in biology and appears to be well-accepted, even though it relies, to some extent, on the analyst’s subjective judgment” (Thompson and Ford, DNA Typing: *426 Acceptance and Weight of the New Genetic Identification Tests, 75 Va L Rev 45, 75 [1989]). According to the Thompson and Ford article, which was written around the same time the trial court decided this case, the Lifecodes test had been admitted in 22 criminal trials by October of 1988. The same article made the observation that matching could be done either visually or by machine:
"The final step in RFLP analysis is to compare two DNA prints to see if they match, and therefore could have originated in the same individual. In most cases, DNA prints are simply eyeballed to see whether they match. The comparison can also be done by machines, which read DNA prints and convert each print into a numerical code. Numerical codes can be compared with one another by computer to determine the degree to which two prints match. Moreover, the use of numerical codes makes possible the creation of large computerized data bases of DNA prints which can be searched to find a match for a given specimen” (id., at 74-75).
It should be noted that novel scientific evidence may be admitted without any hearing at all by the trial court (see, e.g., Matter of Lahey v Kelly, 71 NY2d 135; People v Middleton, 54 NY2d 42, supra). Moreover, the modern trend in the law of evidence has been away from imposing a special test on scientific evidence and toward using the "traditional standards of relevancy and the need for expertise” (1 McCormick, Evidence § 203, at 873-874 [4th ed 1992]).
Thus, the general reliability of DNA matching was established at the hearing. The Frye test — the sole issue before us— requires no more, despite the new and more stringent requirements that would be added under the test proposed by the concurring opinion. It is important to note that some of defendant’s other objections, which were made at the Frye hearing but not at trial, are actually matters going to trial foundation or the weight of the evidence, both matters not properly addressed in the pretrial Frye proceeding.
As to the procedures used by Lifecodes, the only expert witness for the defense on this issue, Dr. Neville Colman, opined that the procedures, methodology, and quality control used by Lifecodes were inadequate to assure the accuracy and reliability of its testing results. However, three of the prosecu *427 tion’s expert witnesses, Dr. Richard J. Roberts, Dr. Kenneth K. Kidd, and Dr. Sandra Nierzwicki-Bauer, reviewed Life-codes’ written laboratory protocols and concluded that the practices and procedures used by Lifecodes in its DNA fingerprinting were generally accepted by the scientific community as accurate, reliable and appropriate.[5]
Dr. Michael Baird, who is responsible for Lifecodes’ standards of quality control, testified that Lifecodes’ quality control program (1) analyzes the quality of the DNA that has been isolated from a piece of evidence to make sure that DNA is of appropriate quality for fingerprinting tests, (2) examines the enzyme digestion to make sure that the correct digestion and fragmentation has taken place, (3) evaluates the DNA fragment separation, the DNA probe and data analysis, and (4) monitors the maintenance of equipment being used throughout the test, as well as the preparation of any reagents.
As for peer review of Lifecodes’ procedures in performing DNA fingerprint testing, even the defense expert agreed that no peer review articles have discredited the RFLP procedures used by Lifecodes.
Defendant’s challenges to the population studies relied on by Lifecodes to estimate the probability of a coincidental match[6] go not to admissibility, but to the weight of the evidence, which should be left to the trier of fact (see, United States v Jakobetz, 955 F2d 786, 796-797, supra). These challenges were never made by the defendant at trial. Such challenges were, however, made at the Frye hearing and were answered by the prosecution. To the extent the defendant at the Frye hearing focused on the inadequacy of the DNA population studies done by Lifecodes as indicative of the unreliability of DNA evidence in general, defendant did not prevail. Once there was testimony as to the reliability of the *428 statistical population studies, the trial court was justified in admitting that testimony. Assuming that the defendant had presented evidence of the inadequacy of those studies, defendant would have been entitled to have the jury consider them, not exclude their admissibility entirely. In any event, the record before us indicates that defendant’s challenge to Life-codes’ population studies lacks merit.
Dr. Richard Borowsky, who was called as a witness for the defense, testified that the population genetics studies performed by Lifecodes were inadequate, and in many ways incorrect. Specifically, Dr. Borowsky stated that the data base used was too small to obtain a Hardy-W einberg equilibrium[7] or linkage disequilibrium.[8] On the other hand, Dr. Kidd stated that in his opinion, and in the opinion of the scientific community in general, the data base used by Lifecodes was sufficiently large for such experiments, and a review of the data submitted by Lifecodes regarding its population genetics study revealed no linkage disequilibrium. Furthermore, Dr. Kidd testified that since there are individual genotypes that have been observed to occur more frequently than expected and others that have been observed to occur less frequently than expected, an adjustment in the claimed mean power of certainty of identification should be made. He opined that the adjustment warranted was much less than a factor of 10, but gave that amount as "the largest estimate” of a possible deviation. A factor of 10 reduced the mean power of certainty of identification for American blacks from 1 in 1.4 billion to 1 in 140 million and for Caucasoids from 1 in 840 million to 1 in 84 million. Here, statistical evidence was admitted based upon expert testimony as to its reliability.
Finally, no support exists in the record for defendant’s claim that Lifecodes may have tried to correct "bandshifting” in this case.
After the Frye inquiry, the issue then shifts to a second phase, admissibility of the specific evidence — i.e., the trial foundation — and elements such as how the sample was acquired, whether the chain of custody was preserved and how *429 the tests were made. This distinct voir dire foundation is presented at the trial and is the same as that applied to all evidence, not just to scientific evidence. This was not part of the Frye hearing or ruling and was not addressed by the trial court here. Indeed, Lifecodes had not completed all the testing here at the time of the Frye hearing. Once Frye has been satisfied, the question is "whether the accepted techniques were employed by the experts in this case” (People v Middleton, 54 NY2d, at 50). The focus moves from the general reliability concerns of Frye to the specific reliability of the procedures followed to generate the evidence proffered and whether they establish a foundation for the reception of the evidence at trial. The trial court determines, as a preliminary matter of law, whether an adequate foundation for the admissibility of this particular evidence has been established.
At trial, the prosecution laid a foundation for the introduction of DNA evidence, but the defendant made no objection at trial that a proper foundation was lacking. Once the Frye reliability and the trial foundation have been established, the evidence is admissible. At this third stage, the jury is left to hear the testimony and consider the weight of the evidence— i.e., "possible infirmities in the collection and analysis of data” (1 McCormick, Evidence § 203, at 877 [4th ed 1992]; People v Middleton, supra, at 51).
CPL Article 440 Motion
Defendant contends that the trial court erred in denying his CPL 440.10 (1) (g) motion to vacate the judgment of conviction based on newly discovered evidence that would have dictated a more favorable result for him at trial. According to defendant, Lifecodes’ practice of visually matching bands on auto-rads, rather than using a computer digitized apparatus to declare matches that fell within three-standard deviations of error, rendered the results of DNA forensic testing performed by that company unreliable under New York State law. Defendant asserted further that he would have received a more favorable verdict if the autorads used by Lifecodes had been produced, and if defense experts, who were unavailable at the time of the trial, had been permitted to properly examine the actual sizing reports. Defendant’s assertions were based on another case, People v Castro (144 Misc 2d 956), which was decided after County Court decided this case.
Defendant’s reliance on Castro is misplaced. In that case, the court concluded that there is general scientific acceptance *430 of the theory underlying DNA identification, and that DNA forensic identification techniques and experiments are generally accepted in the scientific community and can produce reliable results. As for the techniques utilized in that case, however, the court concluded that Lifecodes failed in several major respects to use the generally accepted scientific techniques and experiments for obtaining reliable results, within a reasonable degree of scientific certainty. In this case, the evidence at both the Frye hearing and at trial was that the procedures used by Lifecodes met standards of scientific acceptance and reliability.
We have examined defendant’s remaining arguments and conclude that they are without merit.
Accordingly, the order of the Appellate Division should be affirmed.
APPENDIX
The Nature of DNA Profiling Evidence[9]
Deoxyribonucleic acid (DNA) is a molecule that is present in every cell of the body that contains a nucleus. DNA is identical in every cell of the human body. It is the chemical dispatcher of genetic information and is composed of a double helix, which resembles a spiral staircase or a twisted ladder. The DNA molecule consists of repeated sequences of phosphate and deoxyribose sugar along each strand of the helix. Four types of organic bases, adenine (A), thymine (T), cytosine (C), and guanine (G), are attached to the deoxyribose sugar-phosphate groups on each strand,[10] and the bases on each strand bond in pairs (base pairs) to form the rungs of the double-stranded helix. Due to the chemical composition of these bases, only A from one strand and T from the other strand can bond together (i.e., A-T, T-A), and only G from one strand and C from the other strand can bond together (i.e., GC, C-G). The unique order, or sequence, of the base pairs along the double helix determines the structure of proteins and the regulation of cell activities.
In human beings, DNA is found in all body cells except red *431 blood cells,[11] and each body cell contains the same DNA. An individual’s entire complement of DNA, the genome, exists in that individual’s chromosomes, which are threadlike microscopic bundles consisting of a complex of nucleic acids and proteins found in each body cell.[12] Generally, humans have 46 chromosomes, including a pair of chromosomes that determine the sex of the individual and 22 pairs of autosomes (a total of 44), which are chromosomes that are not involved in sex determination. Individuals receive 22 autosomes plus one X sex chromosome from their mothers, and 22 autosomes plus either an X or a Y sex chromosome from their fathers.
As stated, an individual’s chromosomes contain his or her genome. Genes, which are DNA segments or sequences that are responsible for producing a particular product or function, and of which an individual’s genome is comprised, reside in the chromosomes. For example, individuals have genes that are responsible for producing eyes, ears, and hands. The physical site of a gene on a chromosome is the locus. Each gene is situated at a specific locus on a specific chromosome, and each chromosome contains many loci occupied by different genes. Human beings inherit half of their genes from their mother and the other half from their father.
Alternative genes, such as genes for brown hair or genes for red hair, at a particular locus, are called alleles.[13] At each locus, an individual may have two identical alleles (e.g., two alleles for brown hair) or two different alleles (e.g., one allele for brown hair and one allele for red hair). An individual who has two identical alleles at a particular locus is said to be homozygous for that particular locus, and an individual who has two different alleles at a particular locus is said to be heterozygous for that locus. Each individual has, at most, two alleles at a given locus — one from the mother and one from the father.
Although an individual has, at most, two alleles at a given locus, many different alleles can exist for the same locus *432 within a given population. When multiple alleles exist at a particular locus, the genetic variant is referred to as a polymorphism. Polymorphisms are simply the genetic differences among members of a population, and are caused by the variations in base sequences in the DNA in the population.
The genome of an individual consists of approximately 3.3 billion base pairs, of which only 3 million base pairs differ from one individual to another.[14] It is these areas where the base pairs differ among individuals that provide the basis for DNA identification and have great significance for DNA forensic analysis.
DNA fingerprint identification tests allow scientists to look at the DNA from an individual, or a piece of evidence, and compare it with other DNA. Recently, DNA profiling identification tests have been conducted in laboratories in the United States. Commercial laboratories, such as Lifecodes, Cellmark Diagnostics Corporation and Cetus Corporation, offer DNA testing. In addition, government laboratories, such as laboratories within the Federal Bureau of Investigation and the Federal Drug Enforcement Administration, also perform DNA testing.
The primary technique for DNA testing is Restriction Fragment Length Polymorphism (RFLP) and analysis, which is referred to in the scientific community as Southern Blotting. The Southern Blotting technique detects specific DNA fragments so that a particular gene may be isolated from a sample of DNA and compared with a known sample of DNA. A brief summary of this procedure follows.
(1) Using chemical enzymes, the DNA to be examined is extracted from the evidentiary sample and then purified.
(2) The extracted DNA is then cut into fragments at specific sites by the use of restrictive enzymes known as restriction endonucleases. The restriction endonucleases recognize certain sequences of base pairs along the DNA, and cut the DNA every time it finds the appropriate sequence to produce discrete fragments known as RFLPs. Using different enzymes leads to different DNA patterns for the same individual.
(3) The RFLPs are placed into a semisolid matrix, called an agarose gel, which is then electrically polarized to sort the RFLPs by length so that they can be measured. To accomplish this step, known as "gel electrophoresis,” the agarose gel is *433 placed into a weak electric field, positive at one end and negative at the other. The RFLPs are placed at the negative end of the electric field and, because of their net negative charge, the RFLPs migrate toward the positive end of the field. The distance travelled will depend on the length of the RFLPs. The longer ones migrate more slowly than, and do not travel as far as, the shorter ones. The RFLPs are then separated and sorted according to length.
(4) The sorted RFLPs are chemically split, or denatured, into two separate strands. The single strands are then transferred from the agarose gel onto a nylon membrane, known as a nitrocellulose sheet, where they become permanently fixed in their respective positions according to length on the membrane. The membrane is now known as a "Southern Blot.”
(5) The Southern Blot is then placed in a solution containing short single strands of known sequences of base pairs in DNA fragments, called genetic probes. The genetic probes are tagged with a radioactive marker and are used to bond or hybridize with RFLPs on the Southern Blot that contain the complement of that particular core sequence, or variable number tandem repeats to form hybridized polymorphic segments. The radioactive marker determines the position of the genetic probes after they bond with their complementary, single-stranded RFLPs, and facilitates the visualization of the particular RFLP to which the genetic probe is bonded. Any excess DNA is washed away.
It is at this point that any match is made. In his testimony Dr. Michael Baird explained this process and compared it to putting a key into a lock.
"the witness: * * * [T]he DNA probe identifies a particular fragment, which is done in a fashion where there is a matching of sequence or pairing, almost like a lock and key type idea, in that the only right size lock will accept the right size key. If the key, which you can think of as the probe, is a different size, it will not be accommodated by that particular lock. I mean, it’s a very simplistic way to look at it. But it’s a very precise fit, in terms of the probe and DNA that is being analyzed.”
(6) The radioactively marked nylon membrane, with the hybridized polymorphic segment, is then placed on a piece of X-ray film, where the radioactive probes expose the film at *434 their respective locations. Dark bands, which resemble bar codes on grocery items, appear on the X-ray film where the radioactive probes have bonded to the RFLPs, producing the DNA print. The position of each dark band indicates the location of a polymorphic segment on the blot. The location of the polymorphic segment indicates the length of the DNA fragment that contains the segment.
Among humans, there are some sections in DNA in which the precise sequence of base pairs appears in the same order from one person to the next. These are segments in DNA that have the information for proteins that are absolutely essential for bodily functions. However, there are other segments in DNA, polymorphic regions, e.g., genes for eye color, that vary from one person to another. It is these DNA segments that are important for testing. Because these DNA segments may differ a great deal among the population, one can look at individuals in the population and determine whether they have the same DNA segments or whether they have different, polymorphic DNA segments. Usually, individuals have polymorphic segments. In individuals, the length of the DNA fragments that contain the polymorphic DNA segments varies. Thus, the bands on the DNA prints of individuals tend to differ. The choice of restrictive enzymes and genetic probes will also affect the DNA banding pattern of each individual’s DNA sample. Thus, the above process may be repeated using different probes and different enzymes.
(7) The dark bands on the DNA prints are then studied to determine if a match exists between a known sample (e.g., from a crime suspect) and an unknown sample (e.g., from a crime scene or victim). Both visual studies and computer imaging analysis are done to determine whether a match exists. A match exists when the sizes and number of the detected RFLPs in the known and unknown samples are indistinguishable within a permissible degree of error.
(8) Once a match is declared, the DNA prints are again studied to determine the frequency with which a specific allele occurs within a specific population. Population genetics is concerned with allele frequency in a particular population.
Over a two-year period, Lifecodes performed population genetic studies using DNA probes that recognize five hyper-variable loci in the human genome (D2S44, D14S1, D14S13, D17S79, and DXYS14). DNA from approximately 900 unrelated individuals, subdivided into three ethnic groups (African *435 Americans, Caucasoids, and Hispanics) were isolated and successfully hybridized to each DNA probe. The number of distinct DNA fragments identified for each of these regions varied from 30 to more than 80. The allele frequency distribution was determined for each locus. The results showed statistically significant differences, between ethnic groups, in some loci (D2S44, D14S1 and D14S13) but not in others (D17S79 and DXYS14). Overall, the studies concluded that there is a mean power of certainty of identification of 1 in 840 million for Caucasoids and 1 in 1.4 billion for American blacks. Before the population genetics studies were admitted into evidence in this trial, the over-all claimed mean power of identification was reduced by a factor of 10 in order to eliminate any possible Hardy-Weinberg equilibrium or linkage disequilibrium.

. The nature of the DNA evidence sought to be admitted is contained in an Appendix.

. Daubert v Merrell Dow Pharms. (509 US —, 113 S Ct 2786) is not applicable here. In that case the United States Supreme Court held that, at least in Federal courts, the rule of Frye v United States (293 F 1013, supra) was superseded by the Federal Rules of Evidence, particularly rule 702 which allows the court to permit testimony concerning scientific or technical evidence if such evidence will aid the fact finder in understanding the evidence or determining a fact in issue (Fed Rules Evid, rule 702). The Court noted the rigidity of the "general acceptance” rule in contrast to the " 'liberal thrust’ of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion” testimony’ ” (see, Daubert v Merrell Dow Pharms., 509 US —, —, 113 S Ct 2786, 2794, supra, quoting Beech Aircraft Corp. v Rainey, 488 US 153, 169).

. In analyzing the evidence, Lifecodes used three different DNA probes, one for each evidentiary sample.

. Dr. Sandra Nierzwicki-Bauer received a Ph.D. in Microbiology from the University of New Hampshire and was an Assistant Professor of Biology at Rensselaer Polytechnic Institute. Her expertise was in molecular biology and molecular genetic techniques.
*425 Dr. Richard John Roberts received a Ph.D. in Organic Chemistry from the University of Sheffield, in England, and was an Assistant Director for Research at the Cold Spring Harbor Laboratory in Suffolk County. He was a molecular biologist and had done research on restriction enzymes.
Dr. Michael Baird was the Director of Paternity and Forensic Evaluation at Lifecodes Corporation. He has a Ph.D. in Genetics from the University of Chicago. His specialty was genetic testing.
Dr. Kenneth Kidd was a Professor of Human Genetics, Psychiatry and Biology at the Yale University School of Medicine. He was trained as a geneticist, had experience in population genetics and had done research in RFLP studies (The "[u]se of DNA restriction fragment length polymorphisms for gene mapping and for population studies”).
Dr. Neville Colman holds a medical degree and a Ph.D. and is certified by the American Board of Pathology as a clinical pathologist. He is an Associate Professor of Pathology at the Mount Sinai School of Medicine in New York City and Director of the Blood Bank and Hematology Laboratory at the Veterans Administration Medical Center in Bronx County.

. In reaching his conclusion that Lifecodes’ DNA fingerprinting process was accepted by the scientific community, Dr. Kidd not only reviewed Lifecodes’ written laboratory protocols, but also visited Lifecodes’ laboratory and observed a portion of each step in the process.

. Generally, statistical probability studies are admitted as part of the DNA proof in a case. At least one court has, however, precluded such evidence even though DNA evidence of a match was allowed. In Rivera v State (840 P2d 933 [Wyo]) the Supreme Court of Wyoming upheld a conviction for first degree sexual assault and the introduction of DNA profiling evidence. In referring to statistical probability population studies, the court found that the better practice was that they not be admitted. Their admission in the case was held not to be reversible error.

. A Hardy-W einberg equilibrium is a test performed on a sample of a large, random, interbreeding population, whereby one compares the frequencies of alleles or genes in a population with the frequencies with which one would expect to find in the individuals.

. Linkage disequilibrium is a phenomenon whereby a specific allele of one locus becomes associated with another locus on the same chromosome with a frequency greater than expected by chance.

. Sources: US Congress, Office of Technology Assessment, Genetic Witness: Forensic Uses of DNA Tests, at 3-6, 41-50; Prescott, Harley, Klein, Microbiology, at 236-307 (2d ed).

. The unit of DNA consisting of one of the four bases attached to the deoxyribose sugar-phosphate group is called a nucleotide.

. In addition to red blood cells, human blood contains other cells, such as white blood cells, which contain DNA.

. A person’s DNA is the same regardless of the biological sample— blood, hair, flesh — from which it is taken. The genome of an individual does not vary from cell to cell, except in sperm and egg cells, which have half the complement of DNA present in other body cells.

. The differences in alleles is explained by the difference in the ways the base pairs (A-T, T-A, C-G, G-C) arrange themselves along the DNA molecule.

. Identical twins have the same DNA composition.