(August 28, 1997)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DONALD RORABACK, Also Known as DONALD REED, Also Known as TOM REED, Appellant. [662 NYS2d 327] —Cardona, P. J. Appeal from a judgment of the Supreme Court (Lamont, J.), rendered October 6, 1995 in Sullivan County, upon a verdict convicting defendant of the crimes of robbery in the first degree, burglary in the first degree, burglary in the second degree, grand larceny in the third degree and petit larceny.

Defendant was indicted and, following a jury trial, convicted of robbery in the first degree, burglary in the first degree, burglary in the second degree, grand larceny in the third degree

and petit larceny, stemming from allegations that he stole his supervisor's tools, entered a bungalow and stole a safe containing jewelry and personal papers, and returned later that evening to rob its occupants. He was sentenced as a second felony offender to an aggregate prison term of 15 to 30 years.

Defendant's principal contention on appeal is that the People's evidence, which was entirely circumstantial, was legally insufficient to support the verdict in that it failed to establish his identity beyond a reasonable doubt and to a moral certainty. It is settled law that the "moral certainty" standard applicable to cases based solely upon circumstantial evidence is only available to the trier of fact; the correct test for appellate review is " 'whether any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People' " (*People v David*, 234 AD2d 787, 789 [quoting *People v Williams*, 84 NY2d 925, 926], *lv denied* 89 NY2d 1034 *see*, *People v Cabey*, 85 NY2d 417, 420-421).

The evidence revealed the following. On August 18, 1994 at approximately 11:30 P.M., Chaim Tyberg and Rivkie Tyberg, proprietors of a seasonal grocery store in Swan Lake, in the Town of Liberty, Sullivan County, had just returned to their bungalow at the Village Green Bungalow Colony when a large white man wearing dark clothing, a nylon mask and a camouflage hat bearing the logo "Alcoa Texas Siding Supply" entered their bedroom and beat them with an unloaded pistol. During the ensuing struggle with Chaim Tyberg, the perpetrator left behind the gun, hat and some $6,600 scattered about the interior of the bungalow. The intruder absconded with a green tote bag containing approximately $85,000 in end-of-the-season receipts consisting of food stamps and $50 and $100 bills. Several thousand dollars in food stamps were recovered from the front lawn of the bungalow. Immediately after the perpetrator fled, the victims discovered that a small grey safe containing jewelry and personal papers was also missing from their bungalow. Earlier that day, unbeknownst to the Tybergs, a woman discovered a safe by the side of the road in the neighboring community of Grahamsville and reported it to the State Police. Upon inspection, the door of the safe was closed but the bottom was cut out and a piece of metal was pulled back off the bottom revealing the inside of the safe. The safe was recovered by the police and identified by Chaim Tyberg.

Defendant, originally from Texas, fit the physical description of the assailant and worked as a part-time maintenance man

at the bungalow colony in exchange for free housing for him and his wife, who went by the name Deborah Reed. They resided in bungalow 174, which was the only occupied unit in a larger building containing bungalows 174 through 180. Defendant also did plumbing work in the Tybergs' grocery store. On the day of the thefts, defendant and his supervisor, David Goldberg, were using Goldberg's tools to replace the deck in front of defendant's building. However, Goldberg injured his back and went home early, leaving defendant with full access to the tools temporarily being stored in his bungalow. Goldberg recalled that when he left, the interior of bungalow 180 was completely clean.

When police responded to the scene on the night of the thefts, they could not locate defendant but discovered that many of Goldberg's tools were missing and that bungalows 174 and 180 were covered with cement dust later determined to be from a safe lining. A power saw and some tools found in a box inside unit 180 had similar dust on them. At approximately 10:30 P.M. David Sitko, one of the bungalow residents, saw defendant going over from his living quarters to his pickup truck which was in the parking lot. The truck had a Texas registration. Sitko and another resident had a brief conversation with defendant. Defendant held a dark cap in his hand. About an hour later Sitko heard screaming and went to the parking area where he met Rivkie Tyberg. He did not see defendant's truck in the parking area and did not see him again that summer.

The police subsequently learned defendant's name, that he drove a pickup truck and had a previous address in Grahamsville, the same community where the safe was recovered. An arrest warrant was issued for defendant on August 22, 1994. Defendant and Reed were apprehended in Arizona. Their van, which Reed purchased in New Jersey with $6,000 in $50 and $100 bills the day following the thefts, contained Goldberg's tools covered with the same safe lining cement dust, one food stamp, another camouflage hat bearing the logo "Alcoa Texas Siding Supply", a road atlas of North America that had an "X" on the area where Sullivan County would be and a list of the precise jewelry items reported stolen from the safe. The police recovered additional food stamps with serial numbers consecutive to those left at the crime scene from Reed's purse.

Based upon the foregoing facts and the reasonable inferences drawn therefrom, we conclude that a rational fact finder could have determined that defendant was the perpetrator of all the crimes beyond a reasonable doubt. Accordingly, we reject defendant's claim that the evidence was legally insufficient.

We next address defendant's contention that he was deprived of a fair trial due to the cumulative effect of several alleged trial errors. Initially, we find that Supreme Court did not err in failing to instruct the jury to disregard defendant's leg shackles. We note that defendant's counsel did not request such an instruction. In any event, the court took adequate precautionary measures to minimize the possibility that any prejudice would result (*see*, *People v Rouse*, 79 NY2d 934; *cf.*, *People v Paul*, 229 AD2d 932). At defense counsel's request, defendant was seated at the defense table before the jury was brought into the courtroom. As there was no proof that the leg shackles were ever visible to the jury, the absence of a curative instruction was not reversible error.

Defendant next argues that Supreme Court improperly permitted State Trooper Darrin Ruff to testify that approximately three weeks prior to the thefts he impounded an abandoned pickup truck with Texas license plates on the side of the road after having observed its operation with one headlight. Paperwork inside the truck showed a change of address from Texas to New York and that it was owned by Deborah Reed. The next day, a woman identifying herself as Deborah Reed appeared at the station and said she had reported the vehicle stolen to the police. The truck was returned to her. Contrary to defendant's argument, Reed's hearsay statements were not admitted to prove the truth of their content but rather to show how the police utilized the information from the truck to trace defendant to Texas. Introduced for this purpose, Reed's statements did not fall within the hearsay exclusionary rule (*see*, *People v Jordan*, 201 AD2d 961, *lv denied* 83 NY2d 873).

We also reject defendant's assertion that the admission of the statements violated his 6th Amendment right to confrontation under the rule enunciated in *Bruton v United States* (391 US 123).[1] Here, defendant was not jointly tried with Reed, her statements did not constitute a confession nor did they inculpate him (*see*, *People v Eastman*, 85 NY2d 265). Under these circumstances, the introduction of Reed's statements was not error.

We find no error in the admission of the testimony of Soncha Gallo, Reed's employer, that Reed suddenly disappeared from her job following the thefts without collecting her paycheck. Gallo's testimony was relevant to prove a material fact (*see*,

---

1. The *Bruton* rule prohibits the introduction of a nontestifying codefendant's incriminating confession at a joint trial (*Bruton v United States, supra*, at 136; *see*, *People v Eastman*, 85 NY2d 265, 271, n 2; *People v Johnson*, 224 AD2d 635, 638, *lv denied* 88 NY2d 849).

*People v Lewis*, 69 NY2d 321), namely, that defendant fled accompanied by Reed and that he provided her with the money taken from the theft proceeds to purchase their getaway van.

Defendant also contends that Supreme Court should have precluded the testimony of State Police Forensic Scientist Charles Pompa and State Trooper Daniel Tompkins because each involved scientific evidence which was not the subject of pretrial disclosure and because the court failed to conduct a *Frye* hearing to determine its general admissibility (*see, Frye v United States*, 293 F 1013). Tompkins testified that on August 19, 1994, he was assigned to the canine unit and in the early morning hours used his dog, Donovan, to track a human scent (obtained from the perpetrator's camouflage hat) from the roadway in front of the bungalow colony to a grassy area across the road from the victims' grocery store in Swan Lake. Tompkins observed tire prints in the wet grass in the vicinity where Donovan lost the scent. Pompa testified that he performed visual and microscopic examinations, as well as an analysis of certain cement samples collected from various locations at the crime scene including bungalows 174 and 180, from the victims' safe and tools recovered from the van, using a machine called a Fourier Transform Infrared Spectrophotometer (hereinafter FTIR). In describing the FTIR analysis, Pompa explained that the chemical composition of a substance is measured through use of a laser producing a graph or spectrum which is then compared with a computerized trace standards file of 150 known substances. The spectrum from the sample under analysis and the known substance spectrum are then superimposed to create a single visual graph. Using these techniques, Pompa opined that the various samples were all from a safe lining as opposed to ordinary cement or concrete cinder block, and that they could have come from the Tybergs' safe.

Turning first to defendant's disclosure argument, we note that defendant has not shown that Tompkins' investigation generated any reports or documents which the prosecution could have disclosed under CPL 240.20. We also note that the computer-generated spectrums or graphs visually depicting the dissimilarities between the cement safe lining sample and concrete cinder block sample were given to the defense the day after they were obtained by the prosecution and prior to trial. Therefore, the People complied with CPL 240.20 (1) (*see, e.g., People v Germeo*, 188 AD2d 1027).

Defendant's insistence upon the need for a *Frye* hearing with regard to the dog-tracking evidence is misplaced. "The long-recognized rule of *Frye v United States* (*supra*) is that expert

testimony based on scientific principles or procedures is admissible but only after a principle or procedure has 'gained general acceptance' in its specified field" (*People v Wesley*, 83 NY2d 417, 422).[2] In our view, there is no scientific principle or procedure at issue here. The use of a trained canine is an investigative rather than a scientific procedure (*see, People v Dunn*, 77 NY2d 19, *cert denied* 501 US 1219). Thus, a *Frye* hearing was unnecessary and all the People needed to do was lay a proper foundation for the admission of the dog-tracking evidence (*see, People v Vandenbosch*, 216 AD2d 884, *lv denied* 86 NY2d 804; *People v Centolella*, 61 Misc 2d 723). Notably, defendant did not object to the People's foundation for admissibility of this evidence.

We reach a contrary conclusion with regard to the FTIR analysis. Using this method, a forensic scientist can compare the major chemical component of a material based on its characteristic infrared spectrum against the infrared spectrum of a known standard in order to identify it (*see, United States v McCaskey*, 9 F3d 368, 379, *cert denied* 511 US 1042; Lee, *Forensic Science and the Law*, 25 Conn L Rev 1117 [1993]). In our view, this comparison constitutes a scientific test. Although, as the dissent correctly notes, defense counsel failed to argue before Supreme Court the lack of a scientific consensus on the use of this test, the record demonstrates that he, nevertheless, made a request for a *Frye* hearing and, thus, we deem the issue to have been preserved for review (*compare, People v Angelo*, 88 NY2d 217, 223). Furthermore, Pompa's testimony that *he* had used FTIR testing for seven years does not establish its general acceptance in the scientific community. Our review of case law and existing literature on the subject does not reveal a general acceptance of this procedure (*see, People v Jeter*, 80 NY2d 818, 820-821; *Matter of Lahey v Kelly*, 71 NY2d 135, 144; *People v Middleton*, 54 NY2d 42, 49-50). Accordingly, we conclude that Supreme Court lacked a proper basis to admit Pompa's expert testimony without a preliminary inquiry into the procedure's reliability (*see, People v Wernick*, 89 NY2d 111; *People v Wesley*, 83 NY2d 417, 422-423, *supra*; *People v Jeter*, *supra*; *see also, Frye v United States*, *supra*, at 1014).

Although we have found the circumstantial evidence legally

---

**2.** We note that the US Supreme Court replaced the *Frye* general acceptance test originated in 1923 as the standard for admissibility of scientific evidence "with a test based primarily on the reliability and relevance of the scientific evidence" under the Federal Rules of Evidence (Harges and Williams, *Evidence*, 40 Loy L Rev 637, 638 [1994]; *see, Daubert v Merrell Dow Pharms.*, 509 US 579).

sufficient to sustain defendant's convictions upon all of the crimes charged, as to the charges of burglary in the second degree and grand larceny in the third degree pertaining to theft of the safe under counts XI and XII of the indictment, we cannot say that the remaining circumstantial proof was so overwhelming that there was no significant probability that the jury would have acquitted defendant of these charges had it not been for the admission of Pompa's expert testimony (*see, People v Crimmins*, 36 NY2d 230, 242). In light of this conclusion, we find it necessary to hold the appeal in abeyance with respect to these two charges while we remit the matter to Supreme Court for a posttrial *Frye* hearing to consider the reliability of FTIR analysis and report back on its findings.

Mercure and White, JJ., concur.

Casey, J. (concurring in part and dissenting in part). It is our opinion that Supreme Court properly admitted for the jury's consideration the testimony of Charles Pompa and the results of the analysis from the Fourier Transform Infrared Spectrophotometer (hereinafter FTIR) without conducting a *Frye* hearing and, accordingly, we would affirm the judgment of conviction in its entirety.

After establishing his qualifications as a forensic scientist with the State Police, Pompa testified about the different tests he performed on several samples of cement dust taken from tools and areas in the vicinity of the crime scene. During the course of this testimony, which covered over 20 pages, no objection was registered by defendant even when Pompa was asked to identify exhibits (Nos. 82 through 90) representing the FTIR analysis establishing the *similarity* between safe lining and the cement dust samples. Defendant objected only when the People asked Pompa to identify one specific computer-generated spectrum (exhibit No. 91) visually depicting the *dissimilarities* between safe lining and a concrete cinderblock. Notably, this objection was addressed to the People's failure to provide discovery with respect to this exhibit pursuant to CPL 240.20 (1).[1]

The discussion that ensued centered strictly around notice and the timing of the disclosure of this exhibit.[2] At no time did defendant make any argument with respect to the reliability or general acceptance of the FTIR in the scientific community,

---

**1.** Although defendant never specified the statute under which discovery was sought, Supreme Court determined that defendant's objection was made pursuant to CPL 240.20.

**2.** Although defendant ultimately registered an objection to the admission of exhibit Nos. 82 through 90, he gave no reason therefor.

which is the focus and purpose of a *Frye* hearing (*see, People v Wernick*, 89 NY2d 111). Although Supreme Court initially questioned whether the FTIR analysis constituted a "scientific test or experiment", it did so only to decide the applicability of CPL 240.20 (1) (c), in which these terms are used, and not in reference to a *Frye* hearing. Consequently, since defendant's reference to a *Frye* hearing was at best ambivalent, defendant's claim on appeal that Supreme Court erred in ruling this evidence admissible without conducting a *Frye* hearing is unpreserved (*see, People v Angelo*, 88 NY2d 217, 223).

Even if it could be argued that defendant requested and was denied a *Frye* hearing with respect to any or all of this evidence, we nevertheless conclude that such hearing is not warranted as the FTIR is not "novel scientific evidence requiring a determination as to its reliability" (*People v Wesley*, 83 NY2d 417, 422). Pompa testified that he has used the FTIR device for seven years in his job with the State Police to identify the chemical composition of substances (*see, People v Serrano*, 219 AD2d 508, 509, *lv denied* 87 NY2d 907).

Finally, in view of the remaining overwhelming evidence of defendant's guilt with respect to counts XI and XII, the error, if any, attending the admission of this evidence should be considered harmless.

Carpinello, J., concurs. Ordered that the decision is withheld with respect to defendant's convictions of the crimes of burglary in the second degree and grand larceny in the third degree under counts XI and XII of the indictment, and matter remitted to the Supreme Court for a posttrial *Frye* hearing, with Supreme Court to report back within 90 days from the date of this Court's decision. Ordered that the judgment is affirmed with respect to defendant's convictions of the crimes of robbery in the first degree, burglary in the first degree and petit larceny.