OPINION OF THE COURT
Kenneth R. Fisher, J.
In this action for damages resulting from a rear-end colli *531 sion, plaintiff contends that she has debilitating low back pain. She treated with Dr. Richard C. Dobson, a specialist in physical medicine and rehabilitation, who has sought to provide objective measurements of the limitation in function due to plaintiffs low back pain through the use of a device called a spinoscope. Defendant moves in limine for an order precluding evidence of plaintiffs spinoscopic test results at trial, on the ground that the spinoscope, and the discipline of spinoscopy, has not gained general acceptance in the scientific community. A Frye hearing was held last Friday during trial outside of the presence of the jury, during which the testimony was taken of the spinoscope’s inventor, Associate Professor Serge Alain Gracovetsky, Ph D, of Concordia University, Montreal, Quebec. Dr. Gracovetsky is also president of Spinex Medical Technologies, Inc., the manufacturer and marketer of the lumbar spinoscope. He has sold 71 machines since the first one was manufactured in 1988, and delivered to a Utah purchaser. Gracovetsky estimates that some 50 to 60 are in actual use today. They cost approximately $150,000 each. Two of these are in New York, one in Dr. Dobson’s office in Rochester, and another somewhere, Gracovetsky thinks, in Long Island. Gracovetsky acknowledged in his testimony that he came to Rochester as a favor to Dr. Dobson, and in an effort to secure wider acceptance of spinoscopy.
Spinoscopy proceeds on the assumption that a conventional clinical examination of a patient who has suffered so-called soft tissue back damage is largely unavailing, and that there is a need for standardization in the field of diagnosing and treating low back pain. The spinoscope is a noninvasive “machine” employing a high-resolution, computer-aided system which tracks the motion of skin markers (infrared light emitting diodes) placed over the spine or spinus processes and iliac crests. A dynamic imaging system is used to measure spinal function which employs a high-resolution infrared three-dimensional camera system. As the subject moves, the camera system collects, at a rate of some 180 images per second, kinematic data from the strategically placed skin markers. At the same time, the activity of paraspinal muscles in the L5 region are recorded with bilateral surface electromyography employing skin surface electrodes. The measurements are then analyzed and otherwise combined with conventional clinical evaluation data.
Gracovetsky published a study in 1995, which discovered that consistent patterns of skin marker motion exist among *532 normal subjects, which provide a database for normal lumbar spine skin marker movement during flexion-extension and lateral bending, whether under load or not. (Gracovetsky and Newman, A Database for Estimating Normal Spinal Motion Derived from Noninvasive Measurements, Spine 20:1036-1046 [1995] .) He concluded that the “variation of patterns among normal individuals is small, in spite of the [normal] subject’s freedom of motion,” and that this data “supports the hypothesis that spinal motion contains invariant patterns perhaps more related to the species than the individual.” (Id., at 1045.) The authors concluded, however, that further study was needed “to ascertain if these patterns are pertinent to the identification of pathology.” (Ibid.)
The next year, in 1996, Gracovetsky published another study, the title of which explains its subject. (Newman and Gracovetsky, Can the Computerized Physical Examination Differentiate Normal Subjects from Abnormal Subjects with Benign Mechanical Low Back Pain?, 11 Clin Biomech [No. 8], at 466-473 [1996] .) The study acknowledged, and Gracovetsky confirmed in his testimony, that “this is the first study demonstrating that an automated, non-invasive physical examination of the lumbar spine, improved by including measurements with loads, can be performed and provides clinically relevant data.” (Id., at 472.) Beyond that general observation, the authors ventured little, acknowledging that their data was gleaned from a “relatively restricted number of subjects,” and that otherwise the study was hampered by shortcomings. (Ibid.) Nevertheless, the authors asserted that the results “implie[d] that different degrees of mechanical dysfunction are distinguishable and can be quantified by the [spinoscope] machine [thereby] permitting] the physician to make objective therapeutic decisions and outcome evaluations.” (Id., at 472-473.)
Separately, a study was published in 1996 which graded the relative efficacy of spinoscopy against competing technologies of thermography, triaxial dynamometry, and conventional clinical evaluation. (Leclaire and Esdaile, Diagnostic Accuracy of Technologies Used in Low Back Pain Assessment, Spine 21:1325-1331 [1996].) The Leclaire study observed that “[n]o systematic validation studies have been performed on the spinoscope” (id., at 1328), but this comment obviously did not take into account Gracovetsky’s nearly simultaneous work described above which was published the same year. The authors concluded that thermography was “not a useful technique in the evaluation of recent onset low back pain * * * *533 [and that] [t]riaxial dynamometry and spinoscopy provided results that were clinically and statistically superior to those for thermography and remarkably similar to the result of the clinical examiners.” (Id., at 1329.) The authors concluded further that “spinoscopy perform[ed] as well or better than that of clinical examination on a single visit, especially if an individual is simulating either the presence or the absence of low back pain.” (Ibid.) Nevertheless, the authors pointed out that spinoscopy failed to “achiev[e] a high level of success in detecting simulators [thereby indicating that] considerable inaccuracy remains, and [that] spinoscopy alone could [not] be relied on to determine the true clinical status of an individual patient.” (Ibid.) In any event, the authors recognized that their study and findings “apply only to * * * patients with low back pain of less than 10 weeks’ duration in the absence of radiculopathy, neurologic abnormalities, or important radiographic disease.” Such patients involve “the most common type of low back pain encountered in clinical practice.” (Ibid.) In the case at bar, plaintiff is claiming permanency of low back pain.
Dr. Gracovetsky submitted to the court two other manuscripts, one already accepted for imminent publication in Spine and the other still in preparation. The first, Gracovetsky and Newman, Evaluation of Clinician and Machine Performance in the Assessment of Low Back Pain (1997), accepted for publication, was designed to test the relative efficacy of conventional clinical examination in detecting low back pain against spinoscopic examination. The authors found that conventional clinical evaluators were more accurate with honest patients, that the spinoscope was more accurate with simulators/ dissimulators, and that statistically, at least, the two methods were roughly equivalent in success. The authors concluded that, because conventional clinicians collect information via multi-disciplinary considerations beyond the sensory range of the spinoscope, use of the spinoscope, “[l]ike all paramedical tests * * * must be done in conjunction with a full clinical examination, and its results integrated by the clinician.” (Ibid.)
The second manuscript, still in preparation, focuses almost entirely on the shortcomings of conventional clinical examination of subjects with low back pain, and limits its conclusion to the observation that, because clinical evaluation “breaks down completely when the subject is less than forthright[,] [i]n those cases, the clinician would benefit from having objective means to measure the function of the lower back.” (Gracovetsky and Newman, Discriminating Power of Clinicians and Machine in *534 the Assessment of Low Back Dysfunction [Apr. 11, 1997].) Although the body of the manuscript treats the success of the spinoscope, the conclusion ignores this aspect.
At the Frye hearing, Gracovetsky testified that 100 to 150 insurance companies in the United States reimburse for spinoscopic examinations, but he acknowledged that the list of companies which do not reimburse “is as long as the list of companies that do.” Plaintiffs produced as exhibits at the hearing letters from two users of the spinoscope, in Florida and Arizona, attesting their success with the machine. In addition, plaintiffs produced a letter from the president of the Spinoscopic Association, and a letter from a member of the Pennsylvania Medical Society Liability Insurance Company attesting to his use of the machine and that insurance coverage would be provided. Finally, a favorable report from a Rhode Island insurance company risk management outfit was produced.
Gracovetsky conceded, however, that the spinoscope, and spinoscopy, in general, are not terms included in Stedman’s Medical Dictionary, nor is a spinoscope listed as a diagnostic tool in the American Medical Association, Guidelines to the Evaluation of Permanent Impairment (4th ed 1995). Given that his studies date back only to 1996, it is doubtful that Gracovetsky’s work would be included in works published before then. But the court’s own research discloses that the spinoscope is not listed in the 1997 edition of the Medical Device Register either.
Because the spinoscope test results are “presented as novel scientific evidence[,] [the court] required] a determination as to [their] reliability”. (People v Wesley, 83 NY2d 417, 422 [1994] [plurality opn per Smith, J.].) The hearing pursuant to Frye v United States (293 F 1013 [DC Cir 1923]) is designed to determine whether the proposed expert testimony is based on “a principle or procedure [which] has ‘gained general acceptance’ in its specified field.” (People v Wesley, 83 NY2d, at 422 [plurality opn], quoting Frye v United States, 293 F, at 1014.) “[T]he particular procedure need not be ‘unanimously indorsed’ by the scientific community but must be ‘generally acceptable as reliable’ ”. (People v Wesley, 83 NY2d, at 423 [plurality opn], quoting People v Middleton, 54 NY2d 42, 49 [1981]; see also, People v Wesley, 83 NY2d, at 435 [Kaye, Ch. J., concurring in result] [“(t)he Court agrees unanimously that where the scientific evidence sought to be presented is novel, the test is that articulated in Frye * * * in essence whether there is general acceptance in the relevant scientific community that a tech *535 ñique or procedure is capable of being performed reliably”].) There are three aspects that must be considered:
“The first—the Frye hearing—asks whether, theoretically, the accepted techniques, when performed as they should be, generate results generally accepted as reliable within the scientific community * * *
“Next, a foundational inquiry must be satisfied before such evidence is placed before the jury: in each case the court must determine that the laboratory actually employed the accepted techniques * * * Finally, infirmities in collection and analysis of the evidence not affecting its trustworthiness go to weight, to be assessed by the jury.” (People v Wesley, 83 NY2d, at 436 [Kaye, Ch. J., concurring in result].)
We here are concerned only with the first inquiry—that undertaken at a Frye hearing.
Plaintiffs point to an unpublished trial ruling by a United States Magistrate Judge in Hawaii in favor of admissibility of spinoscope evidence. (Agudo v Peterson, US Dist Ct, Haw, July 30, 1996, civ 94-760 BMK.) Although Federal Rules of Evidence rule 702 permits consideration of general acceptance in the scientific community under Daubert v Merrell Dow Pharms. (509 US 579 [1993]), that criterion is only one of at least four factors which ultimately must be considered together, but need not individually be attained, in the “more flexible” admissibility determination applicable in Federal courts. Under the Frye test applicable in New York, general acceptance in the relevant scientific community is the sole test applied at the Frye hearing, or first stage inquiry. In any event, the Federal District Court’s ruling in Hawaii does not describe the Daubert hearing testimony supporting its ruling, nor does it describe in anything but the most conclusory terms its findings concerning general acceptance. The case is not authoritative, or persuasive. (Compare, People v Wesley, 83 NY2d, supra, at 426 [plurality opn] [prior admission of DNA testimony in 22 criminal trials throughout the United States]; People v Morales, 227 AD2d 648 [2d Dept 1996] [similar widespread acceptance in the courts].)
It is evidently the rule that expert testimony alone may provide a basis for a favorable ruling on general acceptance. (People v Wesley, 83 NY2d, supra, at 437 [Kaye, Ch. J., concurring in result].) In answer to the question whether the spinoscope and discipline of spinoscopy are generally accepted in the scientific community, Gracovetsky answered, “I think so * * * It is growing in acceptance.” To the extent that this answer *536 can be regarded as an affirmation of general acceptance, the opinion is not supported by the evidence produced at the hearing. But the terms of his answer belie any affirmation of general acceptance. Gracovetsky’s answer implicitly acknowledged the fledgling nature of his discipline in the scientific community.
Even if his answer may be interpreted as affirming general acceptance, Dr. Gracovetsky’s foundation for his opinion of general acceptance was limited to three categories of evidence, none of which alone or in combination with the other categories establishes general acceptance of spinoscopy in the diagnosis and treatment of so-called soft tissue or low back pain injury. First, although the machines have been sporadically introduced in several communities since 1988, the articles authored by Gracovetsky, and Leclaire must be seen as the first real introduction of the discipline of spinoscopy into the scientific community. This is confirmed by the two 1996 article surveys submitted by defense counsel, which discount the value of surface electromyography in the diagnosis and treatment of many disorders involving nerve and muscle, but which do not reference spinoscopy or the work of Gracovetsky and his colleagues at Spinex Medical Technologies, Inc. (See, Rechtein and Geldblum, Technology Assessment: Dynamic Electromyography in Gait and Motion Analysis, Muscle & Nerve 19:396-402 [1996]; Haig and Geldblum, Technology Assessment: The Use of Surface EMG in the Diagnosis and Treatment of Nerve and Muscle Disorders, Muscle & Nerve 19:392-395 [1996].) These articles disclaim any evaluation of surface myography applied in the manner, and with the additional technologies, employed by the spinoscope. They do not focus on soft tissue injury or low back pain in particular, the only pathologies Gracovetsky has explored in his literature for application of the spinoscope. It is important to observe that the Leclaire piece was not supportive of spinoscopy, and cannot, even taking into consideration Gracovetsky’s rebuttal (or clarification) at the hearing or in a published letter to the editor of Spine (22:360-361 [1997]),[1] be viewed as supporting general acceptance in the relevant scientific community.
Another aspect of the Gracovetsky literature that is urged on the court to establish general acceptance concerns the peer review process which studies of this sort must undergo and *537 survive before acceptance for publication. Plaintiffs’ contention that peer review and. acceptance for publication signals, without more, general acceptance of spinoscopy in the relevant scientific community is without merit. Peer review by way of independent validation or replication of Gracovetsky’s techniques, together with associated critical analysis in peer-reviewed literature, would, of course, be highly relevant to the general acceptance question. (Compare, People v Wesley, 83 NY2d, supra, at 427 [plurality opn], with People v Wesley, 83 NY2d, at 438 [Kaye, Ch. J., concurring in result].) Similarly, a complete failure to publish in a peer-reviewed scientific journal would be highly relevant. (Cf., Daubert v Merrell Dow Pharms., 43 F3d 1311, 1318-1319 [9th Cir 1995] [on remand], cert denied 516 US 869 [1995].) But here, neither circumstance is present because Gracovetsky’s technique has only been introduced beyond the realm of those to whom he has sold machines, i.e., to the broader scientific community, within the last 18 months. There are no “efforts in the field to ‘validate by replication’ the methods employed at [Spinex Medical Technology]; there ha[s] been neither refutation nor support of the technique in the professional literature.” (People v Wesley, 83 NY2d, at 439 [Kaye, Ch. J., concurring in result].) Other than the equivocal Leclaire article, there is no evidence of how spinoscopy has been received in the relevant scientific community, or indeed whether it much has been recognized beyond the limited community of spinoscopic purchasers (and those other clinicians using their machines) described in Gracovetsky’s hearing testimony.
Acceptance of plaintiffs’ argument would mean that any novel procedure or methodology would gain general acceptance upon its appearance in a peer-review journal. Such a rule thoroughly would conflate the relaxed Daubert standard of admissibility with the Frye standard which seeks to determine general acceptance. Daubert focuses on reliability of methodology, and Frye focuses on general acceptance of the methodology in the relevant scientific community. (Daubert v Merrell Dow Pharms., 43 F3d, supra, at 1319, n 11; People v Wesley, 83 NY2d, at 439 [Kaye, Ch. J., concurring in result] [“The Frye test emphasizes ‘counting scientists’ votes, rather than on verifying the soundness of a scientific conclusion’ ”], quoting Jones v United States, 548 A2d 35, 42 [DC Ct App 1988]; People v Roraback, 242 AD2d 400, 405, n 2 [same].) The peer review of articles written by Gracovetsky is geared toward the former *538 (reliability), but does not indicate, by itself or in combination with the other evidence adduced at the hearing, general acceptance in the relevant scientific community. Putting aside for the moment the question whether Gracovetsky’s work, even if peer reviewed, should not alone establish general acceptance because of his acknowledged interest (People v Wesley, 83 NY2d, at 439-441 [Kaye, Ch. J., concurring in result]), a point on which the Court of Appeals appears to have divided without a clear majority of the court commanding either position,[2] peer review and general acceptance are not coterminous, as Daubert recognized when it made them separate aspects of the four-part inquiry required under the Federal rules. (Daubert v Merrell Dow Pharms., 509 US, supra, at 593.) Moreover, publication in a peer-review journal cannot alone establish the adequacy of peer review, at least to show acceptance of a methodology (perhaps short of “general acceptance”), because publication “is but one element of peer review.” (Daubert v Merrell Dow Pharms., 509 US, at 593.)
Accordingly, the fact that Gracovetsky and others have published their work recently in peer-reviewed journals is relevant to the particular reliability of their technique and that of the spinoscope, but is not without more determinative of the general acceptance criterion, i.e., of the general question of whether spinoscopy is generally accepted as clinically useful in the diagnosis and treatment of soft tissue back injury resulting in low back pain. This conclusion also is supported by the inherent limitations of the peer review process recognized in the literature. (Pelman and Angell, How Good is Peer Review, 321 New Eng J Med 827, 828 [1989] [“peer review is not and cannot be an objective scientific process, nor can it be relied on to guarantee the validity or honesty of scientific research, despite much uniformed opinion to the contrary”]; see generally, on the shortcomings of peer review, Grubin and Hackett, Peerless Science: Peer Review and U.S. Science Policy [1990] [leading study of peer review]; Jasnoff, The Fifth Branch: Science Advisors as *539 Policymakers, at 64-76 [1990] [illustrative shortcomings of peer review]; Symposium, Editorial Peer Review in Biomedical Publication: The First International Congress, 263 J Am Med Assn 1317-1444 [1990]; Peer Commentary on Peer Review: A Case Study in Scientific Quality Control [Harnad ed 1982].)[3]
The second category of evidence relied upon by plaintiff is the fact that some 50 to 60 of the machines are currently in use today throughout the United States and Canada. Gracovetsky testified that many of his machines are used by several clinicians in the communities in which they are placed, not just the actual purchaser of the spinoscope, and that some 300,000 patients have been evaluated. No estimate of what percentage this is of the total low back pain evaluation pool was offered. In addition, plaintiff proffers a few current users’ letter endorsements of spinoscopy and their use of a spinoscope. The fact, however, that Gracovetsky and a number of his followers have been employing spinoscopy for a time “does not establish its acceptance in the scientific community” in general. (People v Roraback, 242 AD2d 400, 405, supra [testifying expert’s personal use of methodology for a number of years does not establish general acceptance].) Absent wider use of the machines among experts and clinicians in the field, the evidence of actual use proffered by plaintiffs cannot alone or in combination with the other hearing evidence establish general acceptance.
The third category of evidence relied on by plaintiffs concerns the acceptance of some insurance companies and risk management boards of reimbursement claims for spinoscopic evaluations. Plaintiffs sought at the hearing to extrapolate from the fact that many such companies have medical departments or boards, a conclusion that there is general acceptance in the medical community of spinoscopy. Plaintiffs failed, however, to adduce evidence linking the decision to reimburse to specific *540 medical board determinations or recommendations in general. Moreover, even if such a link could be inferred, Gracovetsky conceded that the number of companies denying reimbursement approaches or equals the number who do reimburse for spinoscopic exams. Finally, plaintiffs’ evidence did not identify the medical practitioners employed by or consulting with a reimbursing insurance company as members of the “relevant scientific community” contemplated by Frye and People v Wesley (supra).[4]
CONCLUSION
By reason of the foregoing, defendant’s motion to preclude evidence of plaintiffs spinoscope test results is granted. Plaintiffs have not carried their burden to show general acceptance of spinoscopy in the relevant scientific community.

. Gracovetsky’s more extensive rebuttal of the Leclaire criticism, submitted in plaintiffs responding papers, has not been published or undergone peer review.

. The majority opinion was joined only by three Judges, not a full majority of the Court, as two Judges recused, and two concurred in result only. The majority opinion, however, would not appear to endorse admissibility on general acceptance grounds solely on the basis of a commercially interested proponent’s publication of peer-reviewed literature introducing a novel technique into the scientific community. (People v Wesley, 83 NY2d, supra, at 425-427 [plurality opn] [admissibility based on such evidence coupled with considerable courtroom acceptance and considerable expert opinion testimony affirming general acceptance]; People v Morales, 227 AD2d 648 [2d Dept 1996], supra [same—reliance on much case law precedent].)

. This highlights the difference between Daubert and Frye (supra). Under Daubert, the party proffering evidence need only show “reliability of the methodology, and in addressing that question the court and the parties are not limited to what is generally accepted”. (Daubert v Merrell Dow Pharms., 43 F3d, supra, at 1319, n 11.) “Under Frye, the party proffering scientific evidence had to show it was based on the method generally accepted in the scientific community.” (Supra.) Thus, under Daubert, “the fact that one party’s experts use a methodology accepted by only a minority of scientists would be a proper basis for impeachment at trial.” (Supra.) Under Frye, however, the fact that the proffered expert uses a methodology accepted by a minority of scientists in the relevant field is a basis for exclusion, because that fact manifestly negates “general acceptance”.

. The court places no reliance on defendant’s production as an exhibit the letter of Dr. Michael G. Dunn of the Genesee Neurological Associates, P. C., dated August 11,1997, which described “spinometrics to be a relatively worthless test.” The critical assessment of one practitioner is no more indicative of the lack of general acceptance than plaintiffs evidence is of general acceptance.