People v Marryshow (2018 NY Slip Op 04600)





People v Marryshow


2018 NY Slip Op 04600


Decided on June 21, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: June 21, 2018

108133

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
JAHSON MARRYSHOW, Also Known as JAHSON SOLOMON, Appellant.

Calendar Date: May 2, 2018

Before: Egan Jr., J.P., Lynch, Clark, Mulvey and Rumsey, JJ.


Russell A. Schindler, Kingston, for appellant.
D. Holley Carnright, District Attorney, Kingston (Joan Gudesblatt Lamb of counsel), for respondent.


Clark, J.

MEMORANDUM AND ORDER
Appeal from a judgment of the County Court of Ulster County (Williams, J.), rendered September 8, 2015, upon a verdict convicting defendant of the crimes of robbery in the first degree, arson in the third degree and grand larceny in the fourth degree.
In November 2010, defendant was charged by indictment with robbery in the first degree, arson in the third degree and grand larceny in the fourth degree. The charges arose out of allegations that, on a morning in June 2010, defendant stole a dark green 2001 Honda Accord from the home of an elderly couple, set fire to a barn in the Town of Woodstock, Ulster County and, while the authorities were responding to the fire, robbed a nearby bank at gunpoint, making off with roughly $25,000. In June 2015, following his apprehension in Oregon by a United States marshal, defendant stood trial before a jury, at the conclusion of which he was found guilty as charged. County Court subsequently sentenced him, as a second felony offender, to an aggregate prison term of 15 years, followed by five years of postrelease supervision. Defendant now appeals, and we affirm.
Initially, we reject defendant's assertion that Monique Mikell, a witness for the prosecution, should not have been permitted to identify him at trial as the individual she saw driving a green Honda at roughly 7:00 a.m. on the morning in question because her in-court identification was the product of an unduly suggestive photo array. A photo array is unduly [*2]suggestive if some feature or characteristic of one of the depicted individuals or photographs is so unique or distinctive that it draws the viewer's attention to that photograph, thereby indicating that the police have selected that particular individual (see People v Pleasant, 149 AD3d 1257, 1257 [2017], lv denied 30 NY3d 1022 [2017]; People v Al Haideri, 141 AD3d 742, 743 [2016], lv denied ___ NY3d ___ [Oct. 11, 2016]; People v Smith, 122 AD3d 1162, 1163 [2014]). While it is not required that the individuals in a photo array be nearly identical to the defendant, their characteristics must be "sufficiently similar" to those of the defendant, "so as to not 'create a substantial likelihood that the defendant would be singled out for identification'" (People v Lanier, 130 AD3d 1310, 1312 [2015], lv denied 26 NY3d 1009 [2015], quoting People v Chipp, 75 NY2d 327, 336 [1990], cert denied 498 US 833 [1990]; see People v Cole, 150 AD3d 1476, 1477-1478 [2017]). The People bear the initial burden of establishing the reasonableness of police conduct and the absence of any undue suggestiveness; however, the defendant has the ultimate burden of proving that the pretrial identification procedure was unduly suggestive (see People v Delamota, 18 NY3d 107, 118 [2011]; People v Chipp, 75 NY2d at 335; People v Sullivan, 300 AD2d 689, 690 [2002], lv denied 100 NY2d 587 [2003]).
Our review of the evidence presented at the Wade hearing, as well as the photo array including defendant, reveals that neither the pretrial identification procedure nor the photo array was unduly suggestive. Specifically, the evidence established that, at the start of her interview, Mikell was shown two separate photo arrays, each depicting six male individuals who were selected for inclusion in the arrays through the use of a computer program [FN1]. The evidence demonstrated that defendant was included only in the second photo array and that Mikell did not see the second photo array until after she reviewed the first photo array — which was built around a different person of interest — and affirmatively stated that she did not recognize anyone. As further established by the testimony, after being shown the second photo array, Mikell indicated that she recognized defendant as the person who drove past her on the morning of June 30, 2010 in a green Honda.
The photo array itself depicted six males, who all appeared to be of the same general age and stature and had similar hair length and styles, eye color and shape and facial expressions. In addition, each individual was dressed in a prison jumpsuit and wore a white shirt underneath. Five of the six photographs, including defendant's photograph, were taken in front of a block wall that were either identical or substantially similar in color, while the remaining photograph had a different, but similarly colored, backdrop. Furthermore, the photographs were "cropped in a manner that render[ed] height comparisons speculative" (People v Lanier, 130 AD3d at 1313), and they all appeared to have been taken from approximately the same distance. While defendant argues that the photo array was unduly suggestive because there were no other black individuals depicted, we note that all six men were of varying skin tones and that defendant's skin color was not so distinctive that it would have drawn the viewer's attention to that photograph, so as to create a substantial likelihood that he would be singled out for identification (see People v Quintana, 159 AD3d 1122, 1127 [2018], lv denied ___ NY3d ___ [May 30, 2018]; People v Ruiz, 148 AD3d 1212, 1214 [2017], lv denied 30 NY3d 983 [2017]; People v [*3]Matthews, 101 AD3d 1363, 1364 [2012], lvs denied 20 NY3d 1101, 1104 [2013]). Accordingly, upon our review of both the pretrial identification procedure and the photo array, we are satisfied that neither was unduly suggestive (see People v Al Haideri, 141 AD3d at 743; People v Taylor, 300 AD2d 746, 747-748 [2002], lv denied 2 NY3d 746 [2004]). As County Court properly denied the motion to suppress Mikell's pretrial identification of defendant, we find no error in allowing Mikell to identify defendant in court (see People v Asai, 66 AD3d 1138, 1140-1141 [2009]).
Defendant also challenges the robbery and arson convictions as being unsupported by legally sufficient evidence and against the weight of the evidence. Specifically, defendant argues that the People failed to establish his identity as the perpetrator of those crimes beyond a reasonable doubt. As relevant here, "[a] person is guilty of robbery in the first degree when he [or she] forcibly steals property and when, in the course of the commission of the crime . . ., he [or she] . . . [d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm" (Penal Law § 160.15 [4]). Additionally, "[a] person is guilty of arson in the third degree when he [or she] intentionally damages a building . . . by starting a fire" (Penal Law § 150.10 [1]).
At trial, defendant did not strongly contest the evidence establishing his identity as the perpetrator of grand larceny in the fourth degree; nor does he challenge the evidence supporting that conviction on appeal. Indeed, the trial evidence established that, at 7:00 a.m. on the day in question, an elderly woman looked out from her kitchen window and observed a "great tall fellow" get into the dark green 2001 Honda Accord that belonged to her and her husband and "take off" down her driveway. Mikell, who was walking her dog on the elderly woman's street around 7:00 a.m. that same morning, testified that she observed an individual — whom she ultimately identified as defendant — driving at a high rate of speed in a green Honda. Both DNA and fingerprint evidence placed defendant in the stolen Honda Accord, which was located roughly 2½ hours after its theft, at approximately 9:30 a.m., several hundred yards from defendant's family home.
With respect to defendant's convictions for robbery in the first degree and arson in the third degree, the People's case was largely circumstantial, as they solely relied on eyewitness testimony to establish defendant's identity as the arsonist and bank robber. To that end, the People presented the testimony of a volunteer firefighter, who testified that, around 9:00 a.m. on the day in question, he observed a green sedan parked across the street from a barn on Route 212 and then spotted a masked individual, who he could not identify as male or female, standing in the weeds, holding a red gas can. He described the masked individual as roughly six feet tall and slender and stated that the person was wearing a dark jacket and sweatpants, a hood and orange gloves. The People also offered the testimony of another eyewitness who was driving on Route 212, near the barn, around the same time. This eyewitness testified that she observed a tall, slender individual dressed in a black jacket and "grayish" sweatpants run into the road carrying a red gas can and get into a dark green Honda sedan. She stated that, although she did not see the individual's face, she assumed that the person was a man because of his "height and general build." The evidence established that the fire department responded to a fire at the barn around 9:00 a.m. that day and that a subsequent investigation into the cause of the fire revealed that gas was used as an accelerant.
As to the bank robbery, the People relied on the testimony of three eyewitnesses: a motorist who observed a dark-colored Honda turn into the bank, a bank teller and the bank [*4]manager. The motorist testified that, as he was driving to work around 9:10 a.m., he observed a dark-colored Honda pull up behind him at an intersection and noticed that the driver, who was wearing ski goggles and some sort of winter mask or scarf, appeared to be "anxious." Both the bank teller and the bank manager gave similar descriptions of the robber. In particular, the teller testified that a man came into the bank yelling, swearing and brandishing a black handgun and he was dressed in "winter clothes," including long pants, a peacoat, a gray cap, orange gloves, goggles and a mask. Similarly, the manager testified that the robber stood roughly 6 feet 2 inches tall and wore a mask, ski goggles, a hooded sweatshirt, a hat, a peacoat and orange gloves. He stated that, following the robbery, he observed the individual drive off in a dark green late model Honda Accord. It was further established that the bank manager was familiar with defendant, having attended high school with him and interacted with him as a customer at the bank, and that the manager considered both defendant and the robber to have a high-pitched voice. Significantly, the jurors saw surveillance video of the bank robbery from different angles and were able to draw their own conclusions regarding the bank robber's appearance, including attire, height, stature and mannerisms (see generally People v Tucker, 87 AD3d 1077, 1085 [2011]). Finally, as noted above, the stolen Honda Accord was ultimately found with its engine running 20 minutes after the bank robbery, several hundred yards from defendant's family home.
In our view, the foregoing circumstantial evidence, viewed in the light most favorable to the People (see People v Bleakley, 69 NY2d 490, 494 [1987]), was legally sufficient to establish defendant's identity as the perpetrator of the arson and the bank robbery beyond a reasonable doubt (see People v Callicut, 101 AD3d 1256, 1259-1260 [2012], lvs denied 20 NY3d 1096, 1097 [2013]). Although defendant was not positively identified as the masked arsonist and bank robber, we are satisfied that the People presented sufficient circumstantial evidence from which the jury could reasonably infer that defendant set the barn fire and committed the bank robbery after stealing the Honda Accord and, thus, reject defendant's theory that a second person stole the Honda Accord and committed those crimes (see People v Callicut, 101 AD3d at 1259-1260; People v Brown, 92 AD3d 1216, 1217 [2012], lv denied 18 NY3d 992 [2012]; People v Roraback, 242 AD2d 400, 401-402 [1997], lvs denied 91 NY2d 878, 879 [1997]).
As for defendant's weight of the evidence challenge, it would not have been unreasonable for the jury to have reached a different verdict on the robbery and arson charges, considering that the proof establishing defendant's identity as the perpetrator was largely circumstantial and the inconsistencies in the eyewitnesses' accounts brought out on cross-examination. However, any inconsistencies and gaps in the testimony posed credibility issues for the jury, which it ultimately resolved in favor of the People (see People v Young, 74 AD3d 1471, 1472 [2010], lv denied 15 NY3d 811 [2010]). Thus, viewing the evidence in a neutral light, weighing the probative force of the conflicting testimony and considering the relative strength of the inferences to be drawn therefrom, all while deferring to the jury's credibility determinations (see People v Danielson, 9 NY3d 342, 348 [2007]), we find that defendant's convictions for robbery in the first degree and arson in the third degree are in accord with the weight of the evidence (see People v Robles, 115 AD3d 30, 32-33 [2014], lv denied 22 NY3d 1202 [2014]; People v Brown, 92 AD3d at 1217; People v Young, 74 AD3d at 1472).
To the extent that we have not expressly addressed any of defendant's contentions, they have been examined and found to be without merit.
Egan Jr., J.P., Lynch, Mulvey and Rumsey, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1:Although the detective who compiled the photo arrays died in the five years that passed between Mikell's interview and the Wade hearing, another detective involved in the investigation testified that he had personal knowledge as to how the photo arrays were generated.