[877 NYS2d 231]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MAZIN ASSI, Appellant.

First Department, March 26, 2009

**APPEARANCES OF COUNSEL**

*Robert S. Dean, Center for Appellate Litigation*, New York City (*Jan Hoth* of counsel), for appellant.

*Robert T. Johnson, District Attorney*, Bronx (*Peter D. Coddington* of counsel), for respondent.

*Chadbourne & Parke LLP*, New York City (*David M. Raim, Deborah R. Cohen* and *Steven M. Freeman* of counsel), for amicus curiae.

**OPINION OF THE COURT**

Acosta, J.

In this appeal we are required to examine the Hate Crimes Act of 2000,[1] including the effective date of the legislation and whether to limit prosecutions under the Act to crimes committed against an actual person rather than against a building, such as a synagogue.

At about 10 o'clock on Saturday night, October 7, 2000 (the day before the start of Yom Kippur, the holiest day on the Jewish calendar), the live-in custodian of the Conservative Cong. Adath Israel of Riverdale, in the Bronx, checked the synagogue's door before retiring for the night. The door was intact and undamaged.

At about 3:00 A.M. on October 8, the night patrol supervisor for the 50th precinct and his driver noticed a red Honda parked on the northbound service road of the Henry Hudson Parkway, approximately 250 feet from the synagogue entrance. Prominently displayed in front of the synagogue was a six-foot-by-six-foot Star of David, visible from the service road.

The instincts of the officers were piqued because the Honda was parked in an area that was desolate, with no commercial establishments nearby, and because Hondas were frequently stolen in that area. The officers watched the Honda from a concealed location, and a few minutes later it drove off southbound on the Parkway service road. The officers resumed patrol, and approximately six minutes later returned to the area where they again saw the Honda parked near the synagogue, this time discharging passengers who walked toward the synagogue. The Honda left and the officers followed it across the parkway, while running its license plate number through the police car's computer.

At a stop light, the Honda's driver, Mohammed Alfaqih, waved the police over and asked for directions to Manhattan. That question further aroused the officers' suspicions, since the driver had been heading south toward Manhattan just minutes earlier. When the computer indicated the car was legally registered to Ida Alfaqih with a Yonkers address, the police sent the driver on his way. About 10 minutes later, the officers saw

---

1. Recognizing the particularly devastating impact of crimes motivated by bias and prejudice, this enactment provides for enhanced sentencing for certain crimes perpetrated on the basis of race, color, national origin, ancestry, gender, religion, religious practice, age, disability or sexual orientation.

the three passengers walking away from the synagogue, but did not stop them; from all appearances, they had committed no crime.

At 7:45 that morning, a congregant of the synagogue arrived and discovered the left glass panel of the entrance door shattered in a web pattern. Two flame-charred bottles of Devil's Spring vodka lay outside the door—one shattered and the other intact containing a purplish liquid—as well as several small rocks. Both bottles had charred wicks protruding from their necks. The congregant awoke the live-in custodian and they called the police.

Police officers arrived shortly thereafter and secured the crime scene. Detectives removed the charred bottles and wicks, the rocks, a number of purple-stained latex gloves, and purple towels.[2] That night, after retrieving the license plate number of the Honda and the owner's address from the police computer data bank, officers viewed a surveillance tape of the Honda and its passengers. The police culled 40 still photographs. The sergeant and his driver on patrol that night identified Alfaqih as the driver.

Later that day detectives went to the liquor store nearest to Alfaqih's home in Yonkers and showed the still photographs to the sales clerk. The clerk could not identify Alfaqih, but recognized defendant from the neighborhood, and was reasonably certain that defendant had purchased two bottles of Devil's Spring vodka on the evening of October 7, 2000.

Alfaqih was arrested the following day, and a search of the Honda produced a purple towel and more latex gloves, which were submitted for laboratory analysis. The analysis determined that one of the wicks had been torn from the purple towel. Shortly after Alfaqih's arrest, defendant was spotted in Yonkers and was also arrested. Defendant was read his *Miranda* rights, which he waived. At the precinct, after he was again read his *Miranda* rights, defendant first orally and then in writing gave an account of his actions on the night in question without any references to the synagogue. One of the interviewing detectives threw the written statement into the garbage, declaring that it was "bullshit," and told defendant the police had seen him near

---

2. The police crime lab determined that the wick from the vodka bottle had been soaked in 160 proof vodka, i.e., 80% ethyl alcohol and 20% water, and the purple liquid ignited easily at room temperature. The purple liquid was sent to the ATF lab in Maryland, where it was identified as PVC pipe cleaner, a highly flammable substance.

the synagogue, had found the vodka bottles, Alfaqih had been arrested and had given a statement, and that they did not need defendant to prove their case.

In response, defendant stated that he and his companions did not know anyone was inside the synagogue that night. He then explained that the local Arab community had been outraged by news that the Israeli army had shot a Palestinian infant, and he had attended a rally to protest the killing. Defendant expressed his outrage that "the f . . .ing rich Jews in Riverdale send money over there and they buy guns and they are killing people." After defendant calmed down, he began to give a more detailed account of his actions that night, first orally and then in a written statement.

According to defendant, he and his three friends (Alfaqih, Samir El Khairy and Medre Medre) wanted to make a "statement" that would stop the violence in the Middle East. Defendant stated that after he purchased the vodka, Alfaqih drove him, El Khairy and Medre to the service road next to the synagogue. Defendant wore gloves while he put a towel or cloth into one of the bottles. El Khairy and Medre put the wick in the second bottle. Alfaqih drove off as the other three walked to the synagogue. As defendant struggled to light his wick at the front door of the synagogue, either Medre or El Khairy threw the lit bottle and cracked the door. That bottle fell and broke, and defendant lit his wick and placed his bottle by the door. They left, discarding their gloves near the service road, and Alfaqih picked them up in the Honda. Defendant added that had he known that someone lived there, he would not have tried to set fire to the synagogue.

Defendant prevented the officers from writing certain details he provided in his oral statement. Specifically omitted from the statement was his comment about "rich Jews in Riverdale," and that defendant needed to ignite the wick in his bottle several times before it stayed lit. At about 5:30 A.M., after *Miranda* warnings were given for a third time, defendant gave a videotaped statement to an assistant district attorney. That statement was essentially the same as his written statement.

Defendant was convicted after a jury trial of attempted arson in the third degree and criminal mischief in the third degree as hate crimes, two counts of criminal possession of a weapon in the third degree, and aggravated harassment in the first degree.

On appeal, defendant claims, among other things, that the hate crimes statute was not yet effective on the date of the

incident, Sunday, October 8, 2000; that he could not be found guilty of a hate crime where his conduct was directed against a building rather than against a person; and that the trial court improperly permitted the prosecution's expert to provide an opinion that a bottle had broken the synagogue's glass door, based solely on photographs, without conducting a *Frye* hearing (*Frye v United States*, 293 F 1013 [DC Cir 1923]) to determine whether an opinion based on photographs was accepted within the scientific community. We disagree with each of defendant's claims.

■ Defendant's claim regarding the effective date of the law (Penal Law art 485) is without merit. The Hate Crimes Act of 2000 (L 2000, ch 107, enacting Penal Law part 4, tit Y) was signed into law by Governor Pataki on July 10, 2000. Section 9 of the act provided that it "shall take effect 90 days after it shall have become law"; thus the effective date commenced at midnight on Sunday, October 8, 2000—the date of defendant's criminal conduct (*People v Floyd J.*, 61 NY2d 895, 896 [1984] [courts must give effect to the plain meaning of a statute's words]). That the effective date of the statute fell on a Sunday is of no moment. There is simply no functional reason not to enforce a provision specifying conduct as criminal on a Sunday. Certainly, a crime committed on a weekend or holiday is no less serious than one committed during the week. Indeed, the Legislature "may cause statutes to take effect on holidays or Sundays, for it has full power to regulate what shall and what shall not be done on such days" (McKinney's Cons Laws of NY, Book 1, Statutes § 41, Comment at 81, citing *Bloomingdale v Seligman*, 3 NYS 243 [Ct Com Pl 1888] [where the assignment-of-debt law, to go into effect on July 1, 1888, became operative on that date even though it was a Sunday]).

General Construction Law § 25-a does not support defendant's position that the effective date must be on a business day rather than a Sunday. Subdivision (1) of that statute provides:

> "When any period of time, computed from a certain day, within which or after which or before which an act is authorized or required to be done, ends on a Saturday, Sunday or a public holiday, such act may be done on the next succeeding business day."

This is intended to apply in calculating a deadline such as, for example, when a claim must be filed or an obligation discharged. Such a reading is consistent with the objectives of a rule extending a deadline that falls on a Sunday. Although historically

emanating from a reluctance to require that an act relating to a business or legal transaction be undertaken on a Sunday, a Sunday deadline also potentially conflicts with long-standing business and legal practices and may impose an obligation that cannot be met, such as filing a legal document on a date on which the court is closed. The Sunday rule is thus a legislative response to legitimate practical concerns bearing on the deadline by which an affirmative act must be accomplished (*see also* General Construction Law § 20).

Had the Legislature intended to apply section 25-a to the Hate Crimes Act, we believe it would have said so explicitly.

> "A court cannot by implication supply in a statute a provision which it is reasonable to suppose the Legislature intended intentionally to omit; and the failure of the Legislature to include a matter within the scope of an act may be construed as an indication that its exclusion was intended" (Statutes § 74).[3]

The purpose of the 90-day period before the act became effective was simply to give notice of a new criminal statute, and that purpose is fully served by calculating the 90th day without regard to the day of the week on which it falls.

■ Defendant's argument that the Hate Crimes Act does not criminalize actions directed against a building, such as a synagogue, rests on a misreading of the Act, and we reject it. Penal Law § 485.05 (1) provides that

> "A person commits a hate crime when he or she commits a specified offense [which includes arson in the third degree and criminal mischief in the third degree (*see* Penal Law § 485.05 [3])] and . . .

> "(b) intentionally commits the act or acts constituting the offense in whole or in substantial part because of a belief or perception regarding the race, color, national origin, ancestry, gender, religion,

---

3. Indeed, Penal Law statutes that become effective on Sunday are not uncommon. See, for example, the amendments to Penal Law §§ 120.15 (menacing in the third degree) and 125.12 (vehicular manslaughter in the second degree), both effective November 1, 1992, a Sunday; § 460.10 (expanding the definition of the crime of enterprise corruption), effective Sunday, October 19, 2008, "the ninetieth day after it shall have become a law"; § 120.05 (expanding assault in the second degree to include elder abuse), effective Sunday, June 29, 2008; § 120.70 (adding the crime of luring a child), effective Saturday, October 4, 2008, "the sixtieth day after it shall have become a law."

religious practice, age, disability or sexual orientation of a person, regardless of whether the belief or perception is correct."

Clearly the Legislature intended to include crimes against buildings within the purview of the Hate Crimes Act.

Subdivision (1) (b) extends the statute to intentional acts motivated, inter alia, by the religion or religious practice of a "person," which is defined as "a human being, and where appropriate, a public or private corporation, an unincorporated association, a partnership, a government or a governmental instrumentality" (Penal Law § 10.00 [7]). The synagogue was incorporated under the Religious Corporations Law and thus falls squarely under the definition of a "person." Moreover, the synagogue proclaimed itself as a center for Jewish religious practice by displaying a large Star of David outside its entrance. There is no question that defendant chose the synagogue because of the religion or religious practice it represents. To be sure, the synagogue itself only has significance because congregants use it as a center of religious practice. Defendant's actions, although literally directed at the building, were in fact directed at those who utilize the synagogue and attend religious services there (*see People v Uthman*, 31 AD3d 1179 [2006], *lv denied* 7 NY3d 852 [2006]).

A review of the legislative history leaves no doubt that the Legislature intended to include the section 10.00 (7) definition of "person" in drafting the Hate Crimes Act, and further intended to include crimes directed against property within the statute's scope. The legislative findings, set forth in Penal Law § 485.00, note that criminal acts involving violence, intimidation and "destruction of property" based upon bias and prejudice have recently become more prevalent in this state, and are commonly and justly referred to as "hate crimes" specifically because they are directed at victims based on their religion or religious practice, inter alia. Similarly, the memorandum in support of the bill by the legislative representative of the City of New York specifically referred to defacing a synagogue as an example of the type of criminal conduct that would, under this statute, merit the more stringent punishment as a hate crime.

■ Defendant's argument that the People did not prove his acts were directed at a person because there was no showing that he knew the synagogue was occupied when he lit his Molotov cocktail is meritless. The People proved that defendant attempted to set fire to the synagogue in order to tell the "rich

Jews in Riverdale" to stop sending money to the Israeli army. Regardless of whether defendant was aware that a person was in the synagogue at the time, the proof established that he chose as his victim this corporate "person" because of his belief regarding its congregants' race, national origin, ancestry, religion and religious practice. Indeed, defendant is correct in arguing that he did not perpetrate the crime against a specific individual. His targeting of the synagogue was directed toward an entire community.

■ With respect to the alleged trial errors, we hold that a *Frye* hearing was unnecessary before allowing Dr. Whitney to give opinion testimony that a bottle hit the synagogue's door. Dr. Whitney testified as an expert in the fracture analysis of glass and ceramics. Although the broken synagogue door was not available for inspection, Dr. Whitney testified that this was not unusual in his field, where experts frequently opine in products liability cases about the cause of breakage of items that have been discarded.

Dr. Whitney determined, to a reasonable degree of scientific certainty, that the synagogue door had been struck from the outside, and the damage was caused by a bottle, not the rocks found in front of the door. Dr. Whitney examined all the pieces of broken rock and reassembled them into their original form as a single rock. His examination of a full, one-liter bottle of Devil's Spring vodka as an exemplar and the crime scene photos revealed two points of nearly simultaneous impact on the door, the geometry of which was consistent with the vodka bottle rather than a smaller, rock-shaped object. Dr. Whitney had no doubt, based on the evidence, that the bottle, not the rock, had hit the door.

Defendant argues that the trial court erred in admitting Dr. Whitney's testimony based on the photographs, rather than an examination of the broken glass, and that absent that tainted expert testimony, the evidence was insufficient to establish his guilt. Defendant's argument is meritless for several reasons.

Dr. Whitney's expert opinion was not based solely on his review of the photographs, as defendant claims. Apart from reviewing the photographs, Dr. Whitney reassembled the pieces of broken rock and also examined the broken and intact vodka bottles. If the rock had broken the door, glass residue would have adhered to its surface, but Dr. Whitney saw none. He also examined the pieces of broken bottle, which revealed that the cracks that caused the break in the bottle originated at the bot-

tom, confirming his opinion that the bottle's bottom hit the door first. In addition, Dr. Whitney explained that a fractographic examination was useful only to determine which side of the door received the impact, but the fact that the door had been hit on the outside was independently established by the detectives who arrived at the crime scene.

New York courts allow expert testimony when it is based on a scientific principle or procedure that is sufficiently established to have gained general acceptance in its specified field (see People v Wesley, 83 NY2d 417, 423 [1994], citing Frye at 1014). Dr. Whitney testified that experts in his field of fractology commonly testify in products liability cases where the broken product had been discarded, and the trial court actually reviewed scientific literature in the fractology field and concluded that experts rely on photographic evidence.

Dr. Whitney's testimony was thus properly admitted, and his reliance, in part, on the photographic evidence to form his opinion went to the weight to be accorded his opinion by the jury rather than its admissibility (People v Hess, 140 AD2d 895, 897 [1988], lv denied 72 NY2d 957 [1988]; see also Nurik v Ollstein, 231 AD2d 458 [1996]). Here, the trial court properly exercised its discretion in admitting the testimony without a Frye hearing. Dr. Whitney's expertise was able to offer "something significant that jurors would not ordinarily be expected to know already" (People v Young, 7 NY3d 40, 45 [2006]).

There was also sufficient evidence apart from Dr. Whitney's testimony to support the conclusion that defendant intended to burn the synagogue. Defendant told detectives that he intended to send a message to the rich Jews in Riverdale, and in a detailed confession he recounted his actions that night, which included purchasing the highest proof vodka available. He admitted wearing gloves as he and his companions put wicks in the vodka bottles, that one of his friends threw a flaming bottle at the synagogue, and that he placed his bottle with the lit wick in front of the door. Indeed, his admission that one of his cohorts hurled a bottle at the synagogue's door bolsters Dr. Whitney's testimony rather than refuting it.

Finally, defendant's claim regarding his Batson challenge is without merit. Potential jurors challenged because of their age do not constitute a cognizable group for Batson purposes (People v Ortiz, 302 AD2d 257 [2003], lv denied 100 NY2d 541 [2003]; People v Lebron, 294 AD2d 105 [2002], lv denied 98 NY2d 698 [2002]; see also People v Manigo, 165 AD2d 660, 662 [1990] [age

is an acceptable basis for a peremptory challenge]). Nor do we find defendant's sentence to be excessive.

Accordingly, the judgment of the Supreme Court, Bronx County (Steven Lloyd Barrett, J.), rendered May 1, 2003, convicting defendant, after a jury trial, of attempted arson in the third degree as a hate crime, criminal mischief in the third degree as a hate crime, criminal possession of a weapon in the third degree (two counts) and aggravated harassment in the first degree, and sentencing him to an aggregate term of 5 to 15 years, should be affirmed.

TOM, J.P., MOSKOWITZ and FREEDMAN, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered May 1, 2003, affirmed.