[906 NYS2d 758]

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v ROBERT ROBAR, Defendant.

County Court, Sullivan County, August 24, 2010

## APPEARANCES OF COUNSEL

*Ricciani & Jose, LLP*, Monticello (*Jacqueline Ricciani* of counsel), for defendant. *James R. Farrell, District Attorney*, Monticello (*Bonnie M. Mitzner* of counsel), for plaintiff.

**OPINION OF THE COURT**

FRANK J. LaBUDA, J.

By letter motion dated June 14, 2010, reply affirmation dated June 26, 2010 and letter dated August 16, 2010 (which is received as a motion to reargue), defendant seeks to call an expert witness at the trial herein on the issue of normal brain function (NBF) as specifically related to whether and how expectation affects visual perception and causes misperception. The People oppose the motion by affirmation dated June 23, 2010. A hearing pursuant to *Frye v United States* (293 F 1013 [DC Cir 1923]) was held on July 1, 2010 at which the proposed expert witness, David Masur, Ph.D., a neuropsychologist, testified. Supplemental memoranda in letter form were thereafter submitted by both counsel.

Defendant Robert Robar is charged with assault in the second degree (Penal Law § 120.05 [4]), a class D felony, and reckless endangerment in the second degree (Penal Law § 120.20), a class A misdemeanor, for the shooting of Terry Pelton on November 24, 2009. The underlying facts are that defendant was hunting legally and properly on posted hunting camp property when he discharged his hunting deer rifle, shooting another hunter from an adjacent hunting camp, Terry Pelton, in the lower back and buttocks. At the time of the incident, Pelton was wearing camouflage hunter's clothing and was not wearing hunter's orange or other fluorescent or safety article of clothing or gear. The weather was clear and dry with visibility good.

The crimes charged are based on reckless conduct. A person acts recklessly with respect to a result or to a circumstance when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists; the risk must be such that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation (Penal Law § 15.05 [3]). "Recklessly" is a culpable mental state (Penal Law § 15.00 [6]). A person is not relieved of criminal liability for conduct because he engages in such conduct under a mistaken belief of fact, *unless* such factual mistake negates the culpable mental state required for the commission of an offense (Penal Law § 15.20 [1] [a]). Recklessness is included as a culpable mental state for the purposes of Penal Law § 15.20 (1) (a) (*People v Rypinski*, 157 AD2d 260, 263 [4th Dept 1990]).

Defendant has stated, in his statement to police and in his sworn grand jury testimony, that he had 25 years of hunting ex-

perience; that he has taken the hunter's safety courses numerous times and most recently in 2007; that he had hunted at this hunting camp for 15 years; that he believed he was alone in the woods at the time of the incident; and that he saw a deer approximately 100 yards away go into a cluster of trees. He also stated that he both eyeballed and was looking through the scope of his rifle for a total of approximately 10 minutes, focused on the cluster of trees and that he whistled before he shot (stenographic statement of Robert Robar [SS], Nov. 24, 2009, at 3-4, 5-9, 12; grand jury minutes [GJ], examination of Robert Robar, at 31-32, 36, 37, 39, 41, 43, 46-47). Defendant stated variously that he shot at movement in the brush and "brown," or that he saw and shot at what he believed to be the brown fur of a deer, or that he saw and shot at the head, neck and front leg of a deer (SS at 6-7, 12; GJ at 47-48).

According to the defense, Dr. Masur would be asked to educate the jury as to the basic brain function of perception, how we are able to identify objects in our environment and that research findings have shown that experience and expectation may interfere with and impair the accuracy of *split-second recognition of an object.*

Defendant's attorney states that the jury will hear testimony that "defendant believed he was shooting at a deer in the woods, but was mistaken" (Ricciani letter motion dated June 14, 2010). Defendant's attorney further states that she "does not intend to create a so-called hunter's syndrome to explain the incident at bar nor has the defendant ever sought to elicit testimony as to what Mr. Robar actually saw that day" (Ricciani letter dated Aug. 6, 2010; *see also* letter dated Aug. 16, 2010). Rather, she argues that the expert testimony is relevant to assist the jury "to understand . . . what may have occurred when Mr. Robar was in the woods" (Ricciani letter dated Aug. 6, 2010) and "to understand the defendant's perceptions at the time of the incident" (Ricciani letter dated Aug. 16, 2010).

The prosecution argues, inter alia, that the testimony is inadmissible for failure to give adequate notice. While CPL 60.55 and 250.10 control the admissibility of psychiatric/psychological testimony concerning the affirmative defense of the lack of criminal responsibility by reason of mental disease or defect, the defendant herein does not claim to be mentally defective or diseased. Therefore, the proffered testimony is not governed by those statutes and the prosecution's late notice argument must fail.

Rather, defendant seeks to offer expert witness opinion regarding neuropsychological testimony of brain function in support of his defense that he misperceived the target and acted on a mistake of fact and, therefore, did not possess the relevant culpable mental state necessary for the commission of the crimes charged.

The admissibility of expert testimony is addressed to the discretion of the trial court (*Selkowitz v County of Nassau*, 45 NY2d 97, 102 [1978]). The relevant inquiry under *Frye* is whether the proposed testimony is relevant to the facts of the case, whether defendant's witness was a qualified expert, whether the proposed testimony is generally accepted in the scientific community and whether the proposed testimony is beyond the ken of the typical juror.

Firstly, based upon Dr. Masur's curriculum vitae and hearing testimony relating to his education, professional credentials and professional experience, the court determines that Dr. Masur is qualified as an expert to give testimony in the field of neuropsychology.

Secondly, "[i]t is for the trial court in the first instance to determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefitted by the specialized knowledge of an expert witness" (*People v Cronin*, 60 NY2d 430, 433 [1983]). "[A]n expert's opinion must represent a reasonable degree of certainty, and must not be based on supposition or speculation" (*People v Donohue*, 123 AD2d 77, 79 [1987], *lv denied* 69 NY2d 879 [1987] [citations omitted]).

At the hearing, Dr. Masur testified that he could state with a reasonable degree of scientific certainty that a hunter with a lot of experience hunting on the same terrain forms an expectancy based on this experience of seeing deer on the terrain and of never before having seen another human on the terrain; that because the brain has an expectancy to see what it has always seen, i.e., a deer, the ability of the brain to focus on the "novel object," i.e., a human, is impaired; and that this visual processing occurs at the millisecond level.

This court finds that based upon Dr. Masur's testimony and the representative sample of scientific literature which he provided, a "Hunter's Syndrome," which occurs as part of NBF in which a hunter's perception is erroneously processed by the brain at the split-second level because of the hunter's expecta-

tions of seeing a deer, is not within the ken of the jury; and, therefore, such expert testimony might be offered to help a jury understand a hunter's misperception given all the relevant circumstances of the particular incident.

However, Dr. Masur's testimony is offered to explain the defendant's anticipated testimony that he followed the target for some 10 minutes, focused through his scope and saw a deer before shooting. For Dr. Masur's model to be relevant, defendant would have had to act on split-second recognition of his target (NBF), rather than the clarity of focused perception over 10 minutes' duration. Dr. Masur's testimony on the scientific principle of misperception caused by milliseconds of cognitive processing of visual stimuli is not relevant to the anticipated testimony of defendant.

Additionally, while the defendant stated that he believed he was alone in the woods the day of the incident, he never stated that he had never before seen another human in the woods; in fact, the testimony is that defendant had been hunting, both on this trip and on past trips, with other hunters on this property.

None of the commonly known experiences (such as magic shows and depth misperception by air pilots) nor the studies related in the scientific articles offered on the general subject of visual misperception was shown to be analogous to this case, i.e., the real life circumstances related by defendant that he focused to differentiate his target from the surrounding visual field prior to firing his rifle. This is simply not a case of NBF as proffered by the defendant's undisputed facts.

Additionally, Dr. Masur agreed that the general population have experienced different forms of misperception, such as size constancy (objects appear small from a height) and magic shows and understands that the general phenomenon of misperception occurs.

Indeed, the court takes judicial notice that hunting is a common, inherently dangerous activity in the rural Sullivan County community and that the general population here is familiar with and uses camouflage clothing. Additionally, the reason for a hunter wearing camouflage clothing, as well as the risks attached to wearing such clothing in the woods in hunting season, especially without wearing hunter's orange, is known to the general hunting population.

According to the New York State Department of Environmental Conservation, in New York State 80% of all big game hunt-

ers wear hunter orange, despite the fact that it is not a law mandated by the State of New York (*Hunting Safety, The Facts About Hunter Orange*, http://www.dec.ny.gov/outdoor/9186.html [accessed Aug. 24, 2010]). All licensed persons, such as defendant, must have at some point taken a course on safety and know the importance of wearing hunter orange and that it is strongly recommended to wear the blazing orange colors as hunting is a safety hazard to human life. There is no excuse not to wear hunter orange considering the scientific fact that deer are unable to see any sort of fluorescent colors (*id.*).

Moreover, the New York State Department of Environmental Conservation explains "[o]ver the past ten years, 15 New York State big game hunters have been mistaken for deer or bear and killed, and every one of these victims was from that small minority of hunters who did not wear hunter orange" (*id.*)

> "Although safety-conscious hunters have significantly reduced the number of firearms-related injuries, studies show that individuals wearing hunter orange clothing are seven times less likely to be injured than hunters who do not wear the bright fluorescent color. During big game hunting season, people who wear hunter orange are 16 times less likely to be the victim of a visibility-related mishap, and 23 times less likely to be killed in such an incident" (Environment DEC, *Time Grows Short for Big Game Hunting* [Dec. 2009], http://www.dec.ny.gov/environmentdec/59953.html [accessed Aug. 24, 2010]).

Mr. Pelton was not wearing hunter orange and was shot in the back of his camouflage clothing. The court determines that expert testimony on the unconscious functioning of the brain (NBF) under the circumstances herein is not required for the jury to understand the defense that defendant mistook the target, after 10 minutes of focused attention, and shot a man wearing hunter's camouflage with no hunter's orange.

If the jury does not accept that defendant focused on the target but responded to visual stimuli of "movement in the bushes," "brown" or "brown fur," as he has related, after milliseconds of cognitive processing, then no expert explanation of unconscious brain functioning (NBF) is required for the jury to understand the defendant's testimony in this case in which the victim was not wearing hunter's orange.

As to either scenario, and especially considering that defendant immediately came to the aid of the victim, helped him out

of the woods and took him to a hospital, a jury charge on the defense of mistake of fact would be sufficient for the jury to consider and evaluate the defendant's testimony in the context of conduct based on a mistake of fact (*see* Penal Law § 15.20 [1] [a]) as opposed to conduct which disregarded a "substantial and unjustifiable risk" (*see* Penal Law § 15.05 [3]).

As the defendant's testimony describes conduct which is not beyond the ordinary ken of the jury, the expert testimony must be precluded (*see People v Johnston*, 273 AD2d 514 [2000]). Additionally, the court finds that Dr. Masur's testimony is "not sufficiently relevant to outweigh the confusion that would be created by interjecting a collateral issue" into the trial (*People v Lea*, 144 AD2d 863, 864 [1988], *lv denied* 73 NY2d 857 [1988]).

Finally, "[t]he long-recognized rule of *Frye v United States* (*supra*) is that expert testimony based on scientific principles or procedures is admissible but only after a principle or procedure has 'gained general acceptance' in its specified field" (*People v Wesley*, 83 NY2d 417, 422 [1994], citing *Frye*, 293 F at 1014). The scientific principles need not be "unanimously indorsed" by the scientific community but must be "generally acceptable as reliable" in the particular scientific field (*Wesley*, 83 NY2d at 423, quoting *People v Middleton*, 54 NY2d 42, 49 [1981]).

Dr. Masur's testimony was equivocal as to the general acceptance in the scientific community of the principles which he would offer as an expert. He maintained that the general principles of immediate visual cognition were generally accepted in the scientific community. But, he also stated that he knew of no "quantitative data with regard to *specific hunters' perception*" (emphasis supplied) and "it is because the quantitative data usually occurs in studies of reaction time in milliseconds," which would also not apply to the facts alleged by this defendant.

Dr. Masur also stated that the "anecdote" relating a hunting accident used to illustrate the expectation/misperception concept (included in the scientific textbook to which he referred) was not part of an actual scientific study and he allowed that the anecdote included a person who focused on the human target and achieved accurate perception. He further admitted that the concept of expectation was not resolved, not completely understood and continued to be addressed in studies.

In this case, there is no evidence of a "Hunter's Syndrome" specific to this hunter and hunting scenario. Although otherwise the NBF generally accepted in the field of neuropsychology

would be admissible to explain how a hunter, in a millisecond, could mistake a human, the theory does not explain how this defendant, looking through his high powered scope and focused for some 10 minutes in the area of his target, would or could see a deer because he expected to see a deer, rather than another hunter who was actually in the woods.

Accordingly, the court finds that Dr. Masur's testimony would not be relevant and of sufficient probative force for admissibility on the issue presented in this trial (*see Lea,* 144 AD2d at 865).

Based upon the above, it is ordered, that the motion to allow expert testimony by Dr. Masur is denied.